THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MONTE GUNDERSON, Defendant-Appellant.

First District (2nd Division)   No. 76-830

Opinion filed November 8, 1978.

Jerome Feldman, of Chicago (Judith A. Halprin, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BROWN delivered the opinion of the court:

Following a bench trial, defendant, Monte Gunderson, was found guilty of armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 18—2) and sentenced to a term of five to seven years. On appeal he contends that the trial court erred in denying his motion to quash the arrest and suppress the seized evidence and in finding him guilty beyond a reasonable doubt. Co-defendants, Stephanie Crawford and John Kelly are not involved in this appeal.

Prior to trial, the court heard evidence on defendant's motion to quash the arrest and to suppress a paper bag with money recovered at the

time of the arrest. A summary of the pertinent testimony presented during that hearing follows.

Officer Carl Bergman testified that he was a sergeant with the Evergreen Park Police Department and was so employed on October 14, 1974. About 10:30 p.m. on that date, he was present in the Evergreen Park police station at 94th and Kedzie Avenue when he was informed that an armed robbery of the White Hen Pantry at 85th and St. Louis Avenue in Evergreen Park had just been committed by two white males. Officer Bergman and his partner left the station house in an unmarked squad car and proceeded north on Kedzie Avenue to 91st Street and then west on 91st Street. While traveling, they received a radio dispatch message that one of the males was tall, thin, with a mustache, a goatee, and long dark hair, and that the other one was short with a mustache and shorter dark brown hair. They also learned that a sum of money had been taken.

When they came to 91st and Trumbull, the officers saw a vehicle traveling north on Trumbull away from the White Hen Pantry with one headlight out. They had seen only one other car in the vicinity at that time. The officers saw two people in the vehicle and observed that the passenger resembled the description of one of the armed robbers. Making a U-turn, they followed the vehicle for approximately five blocks before they stopped it four blocks north and one block east of the White Hen Pantry.

Bergman further testified that they approached the car with their guns drawn, and ordered the driver and passenger out of the car. It was at this point that Officer Bergman first realized that the driver was a woman. He noted that the passenger was white, tall, with long brown hair, a small goatee, and a mustache. After the passenger got out of the car, the officers at that time saw a third person sit up in the back seat and ordered him out of the car. This third person was a shorter white male with brown hair and a mustache. It was later learned that his name was Monte Gunderson. As he got out of the car, Gunderson said, "Leave the girl out of it, she has nothing to do with it." They then placed all three persons under arrest.

Officer Bergman then proceeded to the passenger side of the car where he observed, through the open door, a paper bag with money "coming out of it." He retrieved the bag and money and the three individuals were taken to the police station.

The testimony of Stephanie Crawford, the driver of the vehicle, corroborated most of the testimony of Officer Bergman pertaining to the stop. She testified that she was pulled over by the officer who had activated his Mars light and spotlight. The officer did not ask for her name or her driver's license at that time. She further testified that both Kelly and Gunderson matched the descriptions given in court.

Following Crawford's testimony, the parties rested. The trial court

denied defendant's motion to quash the arrest and suppress the evidence seized.

At the trial, the following pertinent testimony was presented.

Diane Johnson testified that on October 14, 1974, she worked from 6 to 11 p.m. at the White Hen Pantry at 3440 West 95th Street in Evergreen Park. Nancy Shraaf was also working there that evening. The store had bright flourescent lighting, a U-shaped counter with two cash registers and a safe. There were no customers in the store at approximately 10:30 p.m., when a man, whom Johnson later identified as the defendant, walked into the premises. The man was approximately five feet seven inches tall, medium size in weight with a mustache and short to medium length hair. He appeared to be in his middle twenties.

He looked in the dairy coolers and then proceeded to the ice cream coolers which were located directly in front of the cash registers. At that time he told Johnson that it was difficult to decide what flavor to buy because "they didn't know what they wanted." He also said something about children eating ice cream in cold weather.

A short time later, a tall, skinny man in his early twenties with a goatee and mustache entered the store, whom Johnson later identified as John Kelly. Kelly walked to the back cooler and then approached the defendant, who asked him if lemon custard was "fine." They then proceeded to Johnson's counter to pay for the ice cream. Johnson rang up the sale, turned away to look at the tax chart, and as she looked up, defendant had a gun aimed at her, chest level. Defendant then said, "This is a hold-up, give me your money." Kelly was on the left hand side of defendant. Johnson turned to Shraaf to tell her that defendant had a gun. When she turned back, Kelly held the gun and had moved to the right hand side of defendant.

Both defendant and Kelly told her to hurry up, at which point Shraaf obtained a brown paper bag from under the counter and held the bag while Johnson put the money from her register into it. The women were then directed to go to the back of the store. Johnson believed defendant picked up the bag of money since his hand was last seen on it and he was the closest to it. After the women reached the back of the store, Shraaf called the police.

On cross-examination, Johnson testified that when Kelly had the gun, he held it counter level and behind the safe. She further testified that defendant had asked her if they had a key to the safe.

Nancy Shraaf testified that on October 14, 1974, she had worked for two years at the White Hen Pantry. On that night she worked from 3 to 11 p.m. with Diane Johnson. At approximately 10:30 p.m., a white male with a mustache entered the store. Shortly thereafter another white man entered. He was tall, slim, had long hair, a goatee and a mustache. She

later identified the first man as defendant and the other man as Kelly. Johnson told her that "he had a gun." Then Shraaf heard defendant say, "Give me the money. Put it in a bag." She reached down and pulled out a bag and held it while Johnson put the money in it.

Shraaf further testified that at no time did she observe a gun, but that she could not see Kelly's hands as he was standing behind the safe which blocked her vision. Defendant asked what was under the drawer and also indicated that he did not want the change. He inquired if the women had any money and then declined to take it. Defendant then proceeded to pick up the bag of money and the women went to the back of the store and called the police.

Officer Bergman testified at the trial with the stipulation that his testimony at the earlier motion to suppress be made part of the trial record. After his testimony, the People rested their case.

Defendant renewed his motion to quash the arrest and to suppress the evidence seized. The motion was denied on the basis that the police properly stopped the Crawford car for an investigatory stop and that probable cause for an arrest arose thereafter.

Stephanie Crawford testified for the defense. She stated that on October 14, 1974, she met defendant in front of Ziggy's Tavern at 67th Street and Morgan Park in Chicago at approximately 9:30 p.m. A few minutes later John Kelly came out of Ziggy's and asked Crawford for a ride home. Crawford consented and asked defendant if he would like to come along. He agreed and got into the back seat while Kelly got into the front seat on the passenger's side.

They were driving toward Kelly's home, when they came upon a White Hen Pantry. Gunderson asked Crawford to stop the car because he wanted to get something to eat. Defendant got out of the car and went into the White Hen Pantry. A few minutes later, Kelly followed. When the two men left the store, defendant was yelling at Kelly, asking why Kelly did it. Kelly came back with a small brown paper bag which he placed on the front seat. When Crawford asked what was going on, defendant told her to drive. As they were driving, defendant told Kelly to throw the gun and the money out the window. She saw Kelly throw something out of the window on 91st Street before Trumbull, but she did not know what was thrown.

Crawford stopped the car when she saw the flashing lights of a police car. Her testimony of the events subsequent was consistent with her previous testimony during the hearing on the motion to suppress. She also corroborated the testimony of Officer Bergman by stating that defendant told the police, "Let her go, she didn't have anything to do with it."

Defendant testified that he came to Chicago from New York on October 14, 1974, in order to sell some paint supplies he had been storing

at a friend's house. He was unemployed at the time, but at one time had been a professional building painter.

At approximately 9 p.m., he arrived in the Marquette Park area and met Crawford in front of Ziggy's Tavern. The last time he had seen Crawford was in June of 1973, which was the first time he had ever met her. After a few minutes, Kelly joined them. He had seen Kelly once in June of 1973 and before that in 1966. Kelly asked Crawford for a ride home and Crawford asked defendant if he cared to go along. As they were traveling, defendant asked Crawford to stop at the White Hen Pantry. He got out of the car and entered the store. He went to the dairy coolers first and then to the ice cream coolers, chose lemon custard ice cream and placed it on the counter in front of Johnson. Kelly then entered the store. Johnson rang up the sale and defendant felt a nudge at his side. Kelly was standing on the defendant's left and Kelly told Johnson to put all of the money in a bag and hand it to him. She laughed at first and the defendant smiled because he thought it was a joke. Kelly became angry and told Johnson that he had a gun and he wanted the money. Defendant then saw that Kelly held a gun pointing at the ceiling.

Defendant denied that he ever held the gun and also denied that he announced the robbery. He knew that Kelly had a reputation for violence and therefore, his only role in the robbery was to try to keep the situation calm so that no one would get killed.

Defendant further testified that Kelly grabbed the bag of money and yelled at him to go. As they exited, defendant told Kelly he would not get in the car unless Kelly threw the gun and the money away. Kelly assured him that once they got in the car, he would throw both away. They got in and defendant called Kelly an idiot and asked why he did such a thing. As they were driving, he told Kelly that there was a police car and he better throw the money and gun out. Kelly made a throwing motion with his hand, but defendant did not see what he threw. The car was then pulled over by the police. Crawford got out, then Kelly, and then defendant. As he walked to the back of the car, defendant stated, "Leave the lady alone. She don't have anything to do with it. Ask John Kelly."

After closing argument by both sides, the court found defendant guilty of armed robbery. Defendant's post-trial motion was denied and he was sentenced.

Defendant's first contention on appeal is that the trial court erred in denying his motion to quash the arrest and to suppress the evidence seized.

He maintains that no investigatory stop occurred because the officers approached the car with their guns drawn and no questions were asked of the defendant and his companions. He contends that the arrest occurred at the time the car was stopped and that the arresting officers lacked

probable cause to arrest him. The State responds that the actions of the officers constituted a valid investigation and that subsequent events gave rise to probable cause for the arrest.

Under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, a police officer may approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to arrest. *Adams v. Williams* (1972), 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921, amplified the decision in *Terry* and held that the Fourth Amendment does not require a policeman, who lacks the precise level of information necessary for probable cause to arrest, to simply disregard the situation and allow a criminal to escape. A brief stop of a suspicious individual to maintain the status quo while obtaining more information may be reasonable in light of the facts known to the police officer at the time.

The decision in *Terry* has been codified in section 107—14 of the Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, par. 107—14) which provides:

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation  of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped."

■■ A stop must be justified by specific facts, which, when taken together with rational inferences from those facts, reasonably warrants an intrusion into the privacy of a person. The objective determination to be made is whether the facts available to the officer at the moment of the stop warrant a person of reasonable caution to believe that the action taken was appropriate. (*People v. Sanford* (2d Dist. 1976), 34 Ill. App. 3d 990, 341 N.E.2d 453.) The officer must have more substantial facts than would support a mere hunch, yet less substantial than those necessary to support a finding of probable cause to arrest the defendant. *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537.

In *People v. Sanford,* the arresting officers had the following information: (1) an armed robbery of a gas station had occurred a few minutes before; (2) the police officers were on their way to the scene; (3) they observed a car traveling at higher than normal rate of speed; (4) the vehicle was coming from a direction a car might take leaving the scene of the robbery; (5) it was the only car or one of very few cars on the street at that late hour. After reviewing a number of Illinois cases, the court held

that those facts were sufficient to constitute reasonable justification for questioning the occupants of the vehicle. Due to the fact that the officers had been alerted that there had been an armed robbery, the court found that the use of shotguns by the officers for the purpose of investigating the incident and protecting themselves was also justified. See also *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537; *People v. Attaway* (1st Dist. 1976), 41 Ill. App. 3d 837, 354 N.E.2d 448.

■■ We find that the actions of the officers constituted an investigatory stop. The facts available to Officer Bergman and his partner were sufficient to justify that stop. They had notice of a recent armed robbery involving two described men. They saw a car traveling away from the scene (one of two cars they saw on the road at that time) with two persons in it, one of whom fit the description of one of the armed robbers. They stopped the car and approached with their guns drawn. They were justified in approaching in such a manner since they were not dealing with an ordinary traffic offense, but possibly with armed robbers. They then ordered the driver and passenger out of the car. The fact that the driver was a woman did not make the stop illegal. It was legal before she exited and it was still the duty of the officers to investigate further.

Defendant contends that he was under arrest the instant the car was stopped, and since at that time the officers had only a general description of the armed robbers, they lacked sufficient information upon which to base probable cause for the arrest.

The State asserts that the arrest occurred after all three passengers exited the vehicle and defendant had said, "Let the girl out of it, she had nothing to do with it." It maintains that the arrest was not based upon just a general description, but also upon the facts that the vehicle was traveling away from the scene of the robbery, two of the passengers matched the description of the armed robbers, and the incriminating statement made by defendant after he exited the vehicle. We agree.

A lawful arrest may be made without an arrest warrant if the officer making the arrest has reasonable grounds to believe that the person is committing or has committed an offense. (*People v. Hinton* (1st Dist. 1977), 45 Ill. App. 3d 925, 360 N.E.2d 451; section 107—2(c) of the Illinois Code of Criminal Procedure, Ill. Rev. Stat. 1973, ch. 38, par. 107—2(c).) The test is whether "the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense." (*People v. Robinson* (1976), 62 Ill. 2d 273, 276, 342 N.E.2d 356.) As stated in *People v. Clay* (1973), 55 Ill. 2d 501, 504-05, 304 N.E.2d 280, the existence of probable cause "depends upon the totality of the facts and circumstances known to the officers when the arrest was made" and in solving these problems, courts necessarily "are

not disposed to be unduly technical" as they are dealing with "factual and practical considerations of every day life on which reasonable men, not legal technicians, act."

In *People v. Attaway* (1st Dist. 1976), 41 Ill. App. 3d 837, 354 N.E.2d 448, this court held that the following constituted hard and articulate facts upon which to justify an arrest: (1) defendants' location near the scene of an armed robbery; (2) traveling in a car proceeding in excess of the speed limit and away from the area where the crime was committed; and (3) their physical appearance which satisfied a general description given of the robbers.

◼◼ We find that the facts within the knowledge of Officer Bergman and his partner were sufficient to establish probable cause to arrest.

◼◼ Since there was probable cause to arrest, any search of defendant and the immediate surrounding area was valid. (*People v. Handy* (1st Dist. 1976), 44 Ill. App. 3d 835, 358 N.E.2d 1230.) Officer Bergman testified that after the arrest he looked into the front seat of the car and saw a paper bag with money "coming out of it." This bag was in plain view so that the recovery of the bag was entirely proper under either the plain view doctrine (*People v. Berg* (1977), 67 Ill. 2d 65, 364 N.E.2d 880) or as a search incident to a valid arrest pursuant to section 108—1 of the Illinois Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, par. 108—1).

Since the officer made a valid stop and legal arrest the motion to quash the arrest and suppress the evidence seized was properly denied.

◼◼ Defendant's next contention is that the trial court erred in finding defendant guilty beyond a reasonable doubt. A reviewing court may only disturb the trial judge's finding in a case hinging on the credibility of the witnesses when the evidence adduced below is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. (*People v. Lofton* (1977), 69 Ill. 2d 67, 370 N.E.2d 517.) It is for the trier of fact to determine the weight and credibility of the testimony and where the evidence is merely conflicting the reviewing court will not substitute its judgment for that of the trier of fact, who is in the best position to assess the demeanor of the witnesses. *People v. Droskiewcz* (1st Dist. 1978), 64 Ill. App. 3d 69, 380 N.E.2d 1014; *People v. Mendoza* (1st Dist. 1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318.

At the trial, Johnson testified that Gunderson at one point held the gun and announced the robbery. Both Johnson and Shraaf testified that Gunderson said "hurry up" and that he removed the bag of money from the counter. Shraaf testified that the defendant asked what was under the cash register drawer, whether they had a key to the safe, and told the women to put the money in the bag. This testimony was contradicted by the testimony of the defendant who denied any participation in the robbery.

Although the testimony is conflicting it is for the judge in a bench trial to determine the credibility of the witnesses. We cannot say that the proof was so unsatisfactory as to cause a reasonable doubt of guilt.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.