THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE GRAVES, Defendant-Appellant.

Second District    No. 2—94—0319

Opinion filed June 12, 1996.

RATHJE, J:, dissenting.

G. Joseph Weller, Paul Alexander Rogers, Bonnie J. Bondavalli, and Thomas A. Lilien, all of State Appellate Defender's Office, of Elgin, for appellant.

David R. Akemann, State's Attorney, of St. Charles (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, and Lisa A. Hoffman, Assistant Attorney General, of counsel), and Constance Augsburger, of Law Offices of Dennis Schumacher, P.C., of Mt. Morris, for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, Willie Graves, was indicted on the charge of unlawful possession of under 15 grams of cocaine (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1402(c) (now 720 ILCS 570/402(c) (West 1994))). After a hearing, defendant's motion to quash the arrest and suppress evidence was denied, as were defendant's subsequent motions to reconsider the ruling. On November 5, 1993, defendant was found guilty after a stipulated bench trial and sentenced to one year's imprisonment in the Department of Corrections. Following a denial of defendant's motion for a new trial, he perfected this timely appeal.

On appeal, defendant raises one issue, namely, whether the trial court erred in denying defendant's motion to suppress evidence. Citing this court's opinions in *People v. Harper*, 237 Ill. App. 3d 202

(1992), and *People v. Woods*, 241 Ill. App. 3d 285 (1993), defendant contends that the police lacked the specific and articulable facts to justify an investigatory stop of the taxi in which he was riding. The State maintains that the police officers conducted a valid stop under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and properly seized the cocaine packet that was in plain view.

The only witness at the suppression hearing was the arresting officer, Don Jerome, who testified that, at about 11 p.m. on December 12, 1991, he and his partner, Detective Padron, began a surveillance of 132 Hinsdale Place in Elgin. They were in separate vehicles. The Elgin police department had received information that drugs were being sold from that address during December 1991. Controlled purchases of cocaine had been made at the address by an informant within the week preceding December 13, 1991. Jerome did not personally know who was selling cocaine from 132 Hinsdale Place. Officer Jerome believed that 132 Hinsdale Place was a single-family house, but he was not sure. He did not know who lived in the two-story residence. Officer Jerome had never been in the subject premises, and he did not know whether any other police officer had ever entered it before December 12, 1991.

Officer Jerome testified that between 11 p.m., December 12, and 2 a.m., December 13, four people who came out of 132 Hinsdale Place were arrested for unlawful possession of a controlled substance. Two of the four people arrested made statements indicating that the cocaine in their possession came from that address.

According to Jerome, at about 2 a.m., a taxi stopped three or four car lengths south of 132 Hinsdale Place, although there was parking space available directly in front of the residence. Officer Jerome opined that the taxi parked away from the front of 132 Hinsdale Place in an effort to avoid surveillance. Jerome saw a black man, who was later identified as defendant, get out of the taxi. He did not see anything in defendant's hands. Defendant went to the door of the building at 132 Hinsdale Place. He knocked at the door and was admitted. Officer Jerome stated that he could not see inside the building and that he heard nothing. Defendant came out of the building approximately two minutes later and walked back to the taxi. Officer Jerome again could not see anything in his hands.

The taxi began to drive away. Officer Jerome acknowledged that there was nothing out of order about the taxi and that no traffic offense had been committed. There was another passenger in the taxi, but Jerome had not seen him do anything wrong. No warrant existed for either defendant or the other passenger. As far as Officer Jerome knew, the confidential informant who had told the police about drug sales at 132 Hinsdale Place never mentioned defendant.

Officer Jerome testified that he "believed [defendant] was involved in drug activity that occurred at 132 Hinsdale Place." Officer Jerome and Detective Padron initiated a traffic stop of the taxi and then walked to either side of the vehicle, ordering both passengers to exit it. Jerome stated that it was at this point that he recognized defendant. The officers saw no drugs when they stopped the taxi. Officer Jerome noticed that defendant had "some type of packet" in his left hand. Jerome stated that defendant attempted to conceal the packet to the left side or under the seat as he got out of the taxi. Officer Jerome suspected that the packet contained cocaine and seized it. The contents later tested positive for cocaine.

At the conclusion of the hearing, the trial court denied the motion to suppress. In so holding, the trial court stated:

"[T]he fact that there were four other people that were arrested doing the same thing that night between 11:00 and 2:00 o'clock, under the same circumstances, two of them being named by name, and one of them *** having given a statement stating that she went up there in the same manner as did [defendant], for about the same length of time and she purchased drugs out of there ***.

That plus the one or two statements that they got from the people who were arrested prior to [defendant] gave them probable cause to not only watch the house, but also when they saw somebody acting under the same set of circumstances as they had others, gave them probable cause to stop the cab and look for drugs.

Probable cause arose out of the circumstances of the others that preceded [defendant], as well as [defendant's] actions being somewhat, if not identically similar to the others that preceded him into the house."

Subsequently, defendant filed two motions to reconsider the trial court's denial of his motion to suppress. In the first motion to reconsider, defendant asserted that this court's decision in *People v. Harper*, 237 Ill. App. 3d 202 (1992), required a different result.

In denying the first motion to reconsider, the trial court stated:

"The [*Harper*] decision indicated that this was the first stop on that night and after reviewing the transcript I found that the [*Harper*] Court was, indeed, correct, that this was the first individual stop at the location on the night in question. Therefore, I agree with the Appellate Court decision in the *Harper* case.

[The present] case is somewhat different, in that [defendant] was not the first person that was observed going into the residence under surveillance that night and, in fact, other persons were stopped coming out of the house doing basically the same thing [defendant] was observed doing, were arrested and found to

have had cocaine on their presence [*sic*]. In two cases statements were given by the defendants to the police by the defendants that they had, in fact, purchased the cocaine at that residence on the evening in question ***.

Based on the surveillance of the premises at 132 Hinsdale on the evening in question, the arrest of four subjects that evening for possession of a controlled substance, statements of Lajuana McCain and Karen Malone that they purchased cocaine at the residence, gives the police *reasonable suspicion* that the person has committed or was about to commit a crime. Therefore, I think they properly stopped the cab in question." (Emphasis added.)

At the hearing on the second motion to reconsider, defendant argued that this court's decision in *People v. Woods*, 241 Ill. App. 3d 285 (1993), was controlling. Finding that, in effect, *Woods* did not state that the police lacked grounds to stop a defendant under circumstances similar to those in the instant case, the trial court stated, "[*Woods*] says assuming, arguendo, that the police had grounds to effectuate a stop." The trial court went on to point out that, in *Woods*, the drugs were found under the defendant's hat, while in the case at bar the police saw the packet in plain view as the defendant exited the taxi. The trial court went on to state that, if the *Woods* court had found there was no basis for a *Terry* stop, it would have agreed with defendant's position. The trial court also found it significant that *Woods* did not indicate whether any of the people arrested leaving the building under surveillance had made statements to the police. The motion to reconsider was accordingly denied.

■ In *People v. Perez*, 249 Ill. App. 3d 912 (1993), this court stated: "As a general rule, the law provides that each case must be decided on its own facts, and a trial court's ruling on a motion to suppress will not be disturbed unless it was manifestly erroneous. [Citations.] A police officer may stop and temporarily detain an individual for the purpose of a limited investigation if the officer is able to point to specific, articulable facts which, taken together with reasonable inferences drawn from the officer's experience, would reasonably justify the investigatory intrusion. [Citations.] To determine whether an investigatory stop was based upon a reasonable, articulable suspicion of criminal activity, an objective standard must be applied [citation], and a mere hunch or general suspicion is insufficient." 249 Ill. App. 3d at 915.

■ Our examination of the testimony at the suppression hearing leads us to conclude that the trial court did not err in finding that the stop of the taxi by the officers was based on a reasonable, articulable suspicion of criminal activity as contemplated by *Terry v. Ohio*. There was testimony that controlled purchases of cocaine from the

residence during the week preceding defendant's arrest identified the residence as a location of cocaine supply. Surveillance, searches, and questioning of persons leaving the residence during the three hours preceding defendant's arrest established that cocaine sales from within the residence were at that time ongoing and rampant. Defendant's movements in entering and immediately departing the residence at 2 a.m., while his taxi waited down the block, were consistent with what surveillance had shown to be a typical scenario for drug purchases.

It was unnecessary for the trial court to consider whether these facts established probable cause for defendant's arrest. Under *Terry*, only a reasonable, articulable suspicion of criminal activity is required to support a temporary detention for investigation. There was testimony that, upon stopping the taxi and approaching the occupants, the officers, prior to any search, saw defendant attempting to conceal a small plastic bag or packet under or to the side of the seat. According to Jerome, the packet was of the type commonly used to package cocaine. In our view, this additional observation, when coupled with the events preceding it, was sufficient to establish probable cause for defendant's arrest, thereby authorizing a search of the passenger compartment of the vehicle. *New York v. Belton*, 453 U.S. 454, 460, 69 L. Ed. 2d 768, 775, 101 S. Ct. 2860, 2864 (1981).

Contrary to defendant's contention, we agree with the trial court that *People v. Harper* is distinguishable on its facts. The facts of *Harper* were dissimilar to the present facts in several respects. Notably, however, although the police officers in *Harper* were aware that the premises under surveillance had been used for drug sales in the past, they observed no circumstances demonstrating that criminal activity was afoot on the same night of their stopping the defendant. In essence, we held that mere knowledge that a residence has in the past been used as a "drug house" will not, in itself, justify an investigatory detention of any person who might depart that premises, even after a very brief visit. *Harper*, 237 Ill. App. 3d at 205-06. As noted, however, there were several factors in the present case to demonstrate that drug sales were ongoing immediately prior to defendant's arrest, and defendant's own actions, under these circumstances, naturally aroused suspicion.

Defendant's reliance on this court's opinion in *People v. Woods* is clearly misplaced. Unlike the present case, *Woods* addressed an issue of probable cause to arrest a defendant and to conduct a search of his person incident to that arrest. *Woods*, 241 Ill. App. 3d at 289. It is evident that the officers in *Woods* made an arrest of a defendant leaving a suspected drug house for the purpose of conducting a search

of his person for drugs. The search could not have been justified under *Terry* principles because it went beyond the scope of a valid frisk for weapons. The seizure of drugs could not have been upheld, therefore, absent facts establishing probable cause for arrest. We did not hold that the facts were insufficient to provide a reasonable, articulable suspicion for officers to have stopped the defendant's vehicle for purposes of a temporary detention for investigation. *Woods*, 241 Ill. App. 3d at 290. Again, the central issue in the present case is whether reasonable suspicion existed to stop the taxi, not whether probable cause for defendant's arrest existed prior to the stop. The trial court's ruling correctly recognized this important distinction.

We hold that the trial court committed no error in denying defendant's motion to quash the arrest and suppress evidence and in admitting the challenged evidence. The judgment of the circuit court is affirmed.

Affirmed.

BOWMAN, J., concurs.

JUSTICE RATHJE, dissenting:

I respectfully dissent. In my opinion, this court's decision in *People v. Harper*, 237 Ill. App. 3d 202 (1992), controls the result of the instant appeal. In *Harper*, the issue was whether the arresting officer lacked the sufficient articulable facts to justify an investigatory stop of defendant pursuant to *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

In *Harper*, the subject building was a "known dope house." One of the arresting officers, Detective Mark Brictson, testified that he was aware of prior searches of the building that had turned up narcotics and drug paraphernalia. Further, seven people had previously been arrested near the building for narcotics possession. The *Harper* opinion stated in relevant part:

> "*Defendant's behavior—parking at a location near the building and walking across lawns, entering the door leading to the upper floor and remaining less than a minute—was consistent with that of others Brictson had observed at that location who were later discovered to possess narcotics.*
>
> Brictson admitted, however, that he did not know defendant and he did not see what defendant did once he entered the outer door of the building. Moreover, the record contains no evidence that Brictson observed any crime being committed or that he had received a report of any crime in the area.

\*\*\* On the facts of this case, we conclude that the court's decision to deny the motion to suppress was manifestly erroneous. The facts known to the officers simply did not establish an articulable basis to believe that a crime had been, or was about to be, committed. *The officers merely observed defendant leave a car parked near the subject premises, enter the building, remain for a short time, and leave.* The officers did not observe any transactions within the building or hear any conversations. They did not know what defendant did while inside the building. They had not received a report of any crime or suspicious activity in the vicinity. Their decision to stop defendant was based on no more than a hunch that he might be involved in drug activity." (Emphasis added.) *Harper*, 237 Ill. App. 3d at 205-06.

The *Harper* court found support for its decision in *Sibron v. New York*, 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968), a companion case to *Terry*. The *Harper* court described *Sibron* thusly:

"There the officer had observed defendant talking to several 'known narcotics addicts' over a period of approximately eight hours, but did not hear any conversations or see anything change hands. [Citation.] Finally, the officer approached the defendant and said, 'You know what I am after.' [Citation.] The defendant then reluctantly began reaching into his pocket, but the officer reached in first and recovered an envelope containing heroin. The court reversed the conviction, stating: 'The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.' " *Harper*, 237 Ill. App. 3d at 206, quoting *Sibron*, 392 U.S. at 62, 20 L. Ed. 2d at 934, 88 S. Ct. at 1902.

The *Harper* court concluded:

"In the instant case, the officers did not hear any conversations or observe anything which appeared to be a drug transaction. Indeed, they were completely unaware of what defendant did after he entered the building. He might well have knocked on an inner door, found no one at home, and left. The facts simply do not lead to an articulable suspicion that a crime had been committed." 237 Ill. App. 3d at 206.

In other words, in determining the legitimacy of the *Terry* stop, the *Harper* court placed little or no importance on Brictson's knowledge of the behavior of narcotic users making buys at known drug houses. Rather, in finding that the officers did not have an articulable basis to believe a crime had been committed, the *Harper* court placed primary emphasis on the fact that Brictson had not observed a crime occurring within the building and secondary emphasis on the

fact that police had not received reports of suspicious activity in the vicinity.

Harper's actions were virtually the same as the instant defendant's. Both were in vehicles that parked near, not in front of, the building under surveillance. Both entered the building and remained a short time before reemerging. In both cases, the police did not observe any transactions within the subject buildings, nor did they know what the defendants did inside the buildings. In both cases, the arresting officers did not recognize the defendants prior to the *Terry* stop.

One difference between the cases is that the police in *Harper* were far more certain that drug activities were occurring in the subject building. As noted above, an earlier search of the building had resulted in the discovery of narcotics. Numerous drug arrests had occurred in the building's vicinity. One of the arresting officers had participated in another search of the building in which drug paraphernalia had been found.

In the appeal at bar, the arresting officers could not have described the building at 132 Hinsdale Place as a "known dope house" prior to the night in question. Officer Jerome stated that the police department had received anonymous tips that drugs were being sold from that address. Officer Jerome also testified that controlled buys had been conducted there, but he did not remember exactly when. He did not know who was delivering cocaine from 132 Hinsdale Place. To the best of Jerome's knowledge, 132 Hinsdale Place was a single-family residence, but he was not sure of this. He did not know the names of the people living in the two-story building or how many people lived there. Officer Jerome had never been in the building and, to the best of his knowledge, no other officer had ever entered it before December 12, 1991. According to Officer Jerome, on December 12, 1991, the officers did not have enough information to arrest anyone inside the house or to get a search warrant.

Admittedly, there was suspicious activity in the vicinity of the instant building prior to the instant arrest, a factor which the *Harper* court appeared to place some emphasis upon. However, the building in *Harper* was the scene of ongoing suspicious activity, as evidenced by the searches of same and the numerous drug arrests made near it prior to Harper's arrest.

As defendant points out, the four arrests made before the instant defendant's arrest may have converted a "suspected dope house" into the "known dope house" of *Harper*. Nevertheless, these arrests provided no more of an articulable basis for the *Terry* stop of this defendant than the prior arrests and searches in *Harper* provided an articulable basis for the *Terry* stop in that case.

Moreover, I observe in passing that the trial court relied heavily on the prior arrests and the arrestees' statements to justify this *Terry* stop. There is little evidence in this record as to how these arrests occurred. If, indeed, said arrests were based on the same or similar circumstances as occurred here, then, under *Harper*, they were based on illegal *Terry* stops. It would follow that the *Terry* stop of this defendant was the fruit of prior illegal activity. *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

In conclusion, *Harper* controls this case. Accordingly, the trial court's denial of the motion to suppress was manifestly erroneous.