(text box: 1) NO. 5-01-0653

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Madison County.

)

)  No. 00-CF-1269

)   

COURTNEY HUBBARD, )  Honorable 

)  Ann Callis, 

     Defendant-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE CHAPMAN delivered the opinion of the court:

In May 2001, a jury found the defendant, Courtney Hubbard, guilty of one count each of attempt (first-degree murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2000)) and aggravated criminal sexual assault (720 ILCS 5/12-13(a)(1), 12-14(a)(8) (West 2000)).  The defendant appeals, arguing that the trial court erred in denying his motion to suppress evidence against him that he claims was obtained as a result of an illegal stop.  We affirm.

I. BACKGROUND

On May 17, 2000, at approximately 2:25 a.m., Madison County sheriff's deputies William Papa and Christopher Hoffestot were completing a traffic stop just north of the parking lot of the Piasa Pantry in Godfrey, Illinois, when they noticed the defendant drive into the parking lot in a blue Chevrolet Caprice.  The defendant parked the Caprice and went into the Piasa Pantry to buy some apple juice.  Almost immediately after the officers observed the defendant, they heard a radio transmission informing them that a shooting had occurred on Rocky Ford Road.  The transmission did not include a physical description of the suspect or any other additional information.  The Caprice had approached the Piasa Pantry from the north on Boy Scout Lane, the direction of Rocky Ford Road.  Although someone coming from Rocky Ford Road could have avoided passing the Piasa Pantry on Boy Scout Lane by driving through one of the neighboring subdivisions, Boy Scout Lane was the main route from Rocky Ford Road out of Godfrey.  There was very little traffic in the vicinity at that hour, and the defendant was the only motorist who had driven past the Piasa Pantry on Boy Scout Lane in the 10 minutes the officers had been stopped there.  The officers decided to stop the defendant. 

When the defendant got back into the Caprice and began to drive away, Deputy Papa stopped him while Deputy Hoffestot drove ahead to the home on Rocky Ford Road where the shooting had been reported.  Deputy Papa explained to the defendant that he was stopping him because a shooting had occurred and that he was going to take the defendant to the scene of the crime and would release him if he had nothing to do with the shooting.  He patted the defendant down for weapons, handcuffed him, and locked him in the back of the squad car.  Deputy Papa ran the license plates on the Caprice through the dispatch computer as he drove to Rocky Ford Road, and he discovered that the car was registered to the victim.  

Deputy Hoffestot arrived at the home on Rocky Ford Road from which the shooting had been reported.  There, he spoke with the victim, who told him that she had been shot  and raped.  She told him that her assailant was a black man with braided red hair, that he was wearing a red T-shirt and dark, baggy pants, and that he had driven away in her car.  The defendant matched this description.  When Deputy Papa arrived with the defendant, the defendant was placed under arrest.

Later that morning, detectives Marc McLemore and Scott Sandidge questioned the defendant at the Madison County sheriff's department.  There, the defendant gave a videotaped statement in which he confessed to having shot the complaining witness three times and told the detectives he could lead them to the gun he had used.  The detectives drove him to Boy Scout Lane and recovered the gun where the defendant said it would be.  The defendant later gave another videotaped statement in which he admitted to having had consensual sexual relations with the victim.

On April 26, 2001, the defendant filed a motion to suppress his confessions, any physical evidence discovered "directly or indirectly" as a result of his detention, and the testimony of any witnesses discovered as a result of his detention.  At the May 1, 2001, suppression hearing, Deputies Papa and Hoffestot testified to the facts as stated above.  The trial court denied the defendant's motion, stating that based on all the circumstances, the officers had a reasonable, articulable suspicion to detain the defendant for investigatory purposes.  

At the trial, the complaining witness testified that she regularly purchased crack cocaine from the defendant, whom she knew only as "Redhead."  On the night in question, she picked him up in her car, as was her usual practice.  The defendant told her that he did not have any crack but that he could get some from a friend of his if she would drive him to the friend's house.  She did so.  However, the friend had no crack.  She drove to a second house, where the defendant's contact also had no crack.  At this point, she testified, she was ready to give up and take the defendant back to where she had picked him up.  However, the defendant told her that his cousin would likely have some crack.  The defendant directed her to turn down a dirt road.  He told her to stop the car, showed her that he had a gun, and demanded that she give him all of her cash, which she did.  He then shot her in the knee and told her to get out of the car.  He also took her car keys.  Outside the car, the defendant told  her to take off her clothes and give them to him.  He threw her clothes into the woods and then raped her.  Then he told her to get her clothes, which she did, but she was unable to find her shoes.  The defendant told her to run.  She replied that she was unable to run because he had shot her in the leg.  He then shot her again, causing her to fall to the ground.  She pretended to be dead and the defendant shot her again and drove away in her car.  Medical evidence showed that he shot her a total of five times.  After the defendant drove away, she got dressed and ran to the nearest house for help. 

The complaining witness's testimony was corroborated by other witnesses.  Richard and Melissa Gibson, whose house she ran to, both testified that they awoke to their doorbell ringing "as fast as she could push the bell."  Richard Gibson testified that just prior to hearing the doorbell, he thought he heard three gunshots.  Because the Gibsons allow people to hunt on their property, he did not think this was unusual, however.  Melissa Gibson noted that it was 2:26 a.m. when they awoke to the doorbell ringing.  As they approached the door, they could hear the complaining witness saying: "Help me[.]  I've been shot[.]  I've been raped."  Melissa Gibson called 9-1-1 while her husband answered the door.  At first the complaining witness told Richard Gibson that she did not know who had shot her, but then she told him it was a black man with red hair.

Sara Dobrinich, who also regularly bought crack cocaine from the defendant, testified that in May 2000 she was staying at the home of a friend in Alton.  She saw the defendant selling crack on the street in front of her friend's house nearly every day.  Although she knew that his name was Courtney, she called him "Red," which was what everybody called him.  Early on the morning of May 17, 2000, she saw the defendant get into a blue Chevrolet driven by a woman.  Although Dobrinich did not know who the woman was, she had seen her pick up the defendant in her car to buy crack from him several times before that. 

On May 10, 2001, the jury returned verdicts of guilty on both counts.  On July 18, 2001, the trial court sentenced the defendant to 28 years in prison for attempted first-degree murder and 27 years for aggravated criminal sexual assault, to be served consecutively.  This appeal followed.

II. ANALYSIS

A motion to suppress evidence presents a mixed question of fact and law.  
People v. Cox
, 202 Ill. 2d 462, 465-66, 782 N.E.2d 275, 278 (2002).  While we give great deference to the trial court's findings of fact, we review 
de novo
 its ultimate determination to grant or deny the motion to suppress.  
Cox
, 202 Ill. 2d at 466, 782 N.E.2d at 278.

At the hearing on his motion to suppress, the defendant argued that he had been subjected to an illegal arrest.  The trial court, however, found that his detention, prior to the time he was formally arrested and charged, was a valid investigative detention, or 
Terry
 stop (
Terry
 
v. Ohio
, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)).  Contrary to the State's assertion, the defendant does not concede on appeal that the detention did not constitute an arrest (he states in his brief that a trial court "could find that these conditions constituted an arrest[] but could also find a mere 
Terry
 stop").  The defendant does concede that by transporting him the short distance to the crime scene in handcuffs, the officers did not necessarily turn a 
Terry
 stop into an arrest.  See 
People v. Lippert
, 89 Ill. 2d 171, 184, 432 N.E.2d 605, 611 (1982).  The defendant offers no argument to the contrary, arguing instead that even a 
Terry
 stop was not justified by the facts known to Deputies Hoffestot and Papa at the time they stopped him.

Police officers may briefly detain a citizen to investigate possible criminal activity if they have a reasonable and articulable suspicion to believe that the person detained has committed or is about to commit a crime.  
Terry
, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.  This standard is impossible to define with precision.  
Ornelas v. United States
, 517 U.S. 690, 695, 134 L. Ed. 2d 911, 918, 116 S. Ct. 1657, 1661 (1996).  However, the United States Supreme Court has held that the level of suspicion necessary to justify a detention under the 
Terry
 standard is "considerably less than proof of wrongdoing by a preponderance of the evidence."  
United States v. Sokolow
, 490 U.S. 1, 7, 104 L. Ed. 2d 1, 10, 109 S. Ct. 1581, 1585 (1989).  In evaluating whether a detention is justified by a reasonable and articulable suspicion, courts are to examine the totality of the circumstances known to the officers involved (
United States v. Cortez
, 449 U.S. 411, 417, 66 L. Ed. 2d 621, 629, 101 S. Ct. 690, 695 (1981)) and consider the facts presented from a common sense perspective (
Ornelas
, 517 U.S. at 695, 134 L. Ed. 2d at 918, 116 S. Ct. at 1661).  An investigative detention may also be justified by rational inferences drawn from the known facts.  
People v. Dyer
, 141 Ill. App. 3d 326, 332, 490 N.E.2d 237, 241 (1986).

The defendant contends that the facts known to the officers in the instant case do not justify his detention.  As he points out, the officers did not have a description of the assailant  at the time they stopped him.  They knew only that the defendant's car was coming from the general direction of a crime that had just been reported 1.4 miles away and that his was the only car they had seen pass their location in 10 minutes.  He argues that in other cases where Illinois courts have found 
Terry
 stops to be justified by proximity to a crime scene, the detaining officers either had a description of the suspect or witnessed the defendant do something suspicious, such as drive at a high rate of speed.  In the instant case, by contrast, he contends, the only additional factor to attract the officers' attention was the fact that the defendant was a black man in a predominantly white community late at night.  For the reasons that follow, we conclude that the defendant's proximity in both time and place to the  scene of a serious crime, under the circumstances presented, justified his detention.

The defendant does not expressly argue that he was a victim of racial profiling. Deputy Papa testified that he did not stop the defendant because he was black; however, he also testified that he thought it was unusual to see a black motorist in Godfrey, a predominantly white community.  The fact that the area where a crime has occurred is not generally populated by people of the same race as a suspect can be a factor in establishing a reasonable and articulable suspicion where the race of the perpetrator is known.  See 
People v. Grice
, 87 Ill. App. 3d 718, 723, 410 N.E.2d 209, 215 (1980); 
People v. Jodie
, 79 Ill. App. 3d 348, 356-57, 398 N.E.2d 595, 602 (1979).  This fact, standing alone, however, cannot support an investigatory detention.  See, 
e.g.
, 
Hughes v. State
, 269 Ga. 258, 260, 497 S.E.2d 790, 791-92 (1998) (police did not have grounds to detain a white man in a predominantly black neighborhood late at night even where the officer knew that most whites who visited the neighborhood were there to buy drugs).  This is because in the former context, the racial difference is a factor in 
identifying
 the suspect.  See 
Grice
, 87 Ill. App. 3d at 723, 410 N.E.2d at 215.  In the instant case, Deputies Papa and Hoffestot did not know the assailant's race at the time Deputy Papa stopped the defendant.  The fact that Deputy Papa testified that it was unusual to see a black motorist in Godfrey does not necessarily mean his suspicions were heightened by the inference that, because of his race, the defendant most likely did not live in the vicinity.  Moreover, we find that the detention was reasonable based solely on permissible considerations.

The defendant argues that the instant case is distinguishable from several factually similar cases where suspicion was based, largely, on spatial and temporal proximity to the scene of a crime.  In 
People v. Bujdud
, 177 Ill. App. 3d 396, 402, 532 N.E.2d 370, 373 (1988), for example, an officer knew that a shooting had occurred near the area in which he observed the defendant, he observed the defendant driving away from the direction of the shooting at an excessive speed, and he saw no other cars on the road.  Similarly, in 
People v. Sanford
, 34 Ill. App. 3d 990, 993, 341 N.E.2d 453, 455-56 (1976), officers on their way to the scene of a robbery that had just been reported saw a car traveling at high speed from the direction where the robbery had occurred.  It was "the only car or one of very few cars on the street at that late hour."  
Sanford
, 34 Ill. App. 3d at 993, 341 N.E.2d at 456.  In 
People v. Gunderson
, 66 Ill. App. 3d 516, 518, 383 N.E.2d 1296, 1298 (1978), two officers saw a vehicle traveling in a direction away from the scene of an armed robbery.  The car was one of only two the officers had seen in the vicinity of the crime, and one of the car's occupants appeared to match the description of one of the robbers.  
Gunderson
, 66 Ill. App. 3d at 518, 383 N.E.2d at 1298.  

The crux of the defendant's argument is that these precedents are not precisely analogous to the facts before us in the case at bar.  We find this argument unpersuasive because whether a 
Terry
 stop is justified is an inherently fact-sensitive inquiry that must be determined on a case-by-case basis.  There are no conclusive rules.  
People v. Smith
, 208 Ill. App. 3d 44, 48, 566 N.E.2d 939, 942 (1991).  

The defendant contends, however, that the instant case is more factually analogous to 
People v. F.J.
, 315 Ill. App. 3d 1053, 734 N.E.2d 1007 (2000), and 
People v. Ray
, 327 Ill. App. 3d 904, 764 N.E.2d 173 (2002), than to the above-cited cases.  In these cases cited by the defendant, the reviewing courts found the investigative detentions at issue to be unsupported by a reasonable and articulable suspicion.  We find 
F.J.
 distinguishable and 
Ray
 inapposite.  

In 
F.J.
, as the defendant points out, the officers did not have information about how near in time or place the crime had occurred.  
F.J.
, 315 Ill. App. 3d at 1057, 734 N.E.2d at 1010.  Thus, in that case the proximity to the scene of a recently reported crime was lacking, unlike the case at bar.

In 
Ray
, the Effingham County sheriff's department placed signs along Interstate 57 one-half mile before a rural exit.  The signs stated that a drug enforcement checkpoint was located a half mile ahead on the interstate.  Instead, however, the checkpoint was located at the end of the exit ramp.  
Ray
, 327 Ill. App. 3d at 906, 764 N.E.2d at 175.  The exit was selected for the checkpoint because it was a rural exit with no services.  
Ray
, 327 Ill. App. 3d at 908, 764 N.E.2d at 176.  The officer who initiated the program believed that violators would "self-select themselves" by exiting to avoid the checkpoint they believed to be ahead on Interstate 57.  
Ray
, 327 Ill. App. 3d at 908, 764 N.E.2d at 176-77.  The officer further testified that the fact that a driver leaves the highway at an exit with no services " 'does lend suspicion to him.' "  
Ray
, 327 Ill. App. 3d at 908, 764 N.E.2d at 176.  The purpose of the checkpoint was to look for drivers transporting illegal drugs in their cars, those driving without a valid driver's license or registration or without carrying insurance, and people driving under the influence of drugs or alcohol.  
Ray
, 327 Ill. App. 3d at 909, 764 N.E.2d at 177.  This court held that the stop of the defendant in 
Ray
 was unreasonable because the evidence supporting the stop consisted merely of an "unparticularized suspicion that any person getting off the interstate at exit 151 was suspicious of committing an unnamed crime."  
Ray
, 327 Ill. App. 3d at 910, 764 N.E.2d at 178.  Thus, unlike the instant case, the officers involved in conducting the checkpoint had no reason even to suspect that a crime might occur, let alone that drivers exiting Interstate 57 were involved in it.

Proximity to an area of expected criminal activity is not sufficient, standing alone, to support an investigative detention.  
People v. Elliot
, 314 Ill. App. 3d 187, 192, 732 N.E.2d 30, 35 (2000).  However, proximity to the scene of a specific recently reported crime provides substantially more suspicion than mere presence in a high-crime area.  See 
Lippert
, 89 Ill. 2d at 187, 432 N.E.2d at 612 ("courts have been more protective of individual liberty interests where it is not known that a crime has been committed than where the stop occurs during the period of an immediate investigation of a known crime"); 
Dyer
, 141 Ill. App. 3d at 332, 490 N.E.2d at 241 (rejecting a defendant's argument that he did not act suspiciously by turning his car around because the detaining officer "knew of a specific recently reported crime and did not merely observe 'suspicious' activity in a general area where crimes had previously been committed"); 
People v. Graves
, 281 Ill. App. 3d 386, 390, 667 N.E.2d 96, 99 (1996) (finding knowledge of recent drug sales in a "drug house" sufficient to infer from the defendant's presence in the house that he was engaging in a drug transaction, even though his presence in a known "drug house" alone would not have been enough to justify the detention).

We find both 
Dyer
 and 
People v. Waln
, 120 Ill. App. 3d 73, 457 N.E.2d 979 (1983), closely analogous to the case at bar, although we acknowledge that neither presents precisely the scenario with which we are faced.  In 
Dyer
, an officer heard a report of a robbery at a liquor store.  
Dyer
, 141 Ill. App. 3d at 328, 490 N.E.2d at 238.  Because the suspects were wearing masks, he did not have a description of them other than the fact that they were two white males.  
Dyer
, 141 Ill. App. 3d at 328, 490 N.E.2d at 238-39.  The officer drove his patrol car to the road behind the store.  Two miles from the store, he saw a car heading in a direction away from the store.  As in the instant case, he did not testify that he observed the car traveling at a high rate of speed.  It was the only car he had seen in the vicinity, and there were no other stores, bars, or restaurants in the area.  
Dyer
, 141 Ill. App. 3d at 328, 490 N.E.2d at 239.  In addition, the officer thought it was suspicious that the car turned around given these circumstances.  
Dyer
, 141 Ill. App. 3d at 331, 490 N.E.2d at 241.  This court found, "The aforementioned facts, 
particularly the extreme spatial and temporal proximity to the crime
, establish reasonable cause for the initial stop of the car in which defendant was riding."  (Emphasis added.)  
Dyer
, 141 Ill. App. 3d at 331, 490 N.E.2d at 241.  We emphasized the defendant's proximity to the scene of the reported robbery and the fact that his was the only car on the road.  To the extent the car's reversal of direction provided any additional suspicion to justify the stop, we found that this was so only "given the circumstances."

In 
Waln
, an officer received a radio transmission informing him that two vehicles had left the scene of a burglary of a home.  He had no description of either the vehicles or the suspects.  He stopped two cars at the only entrance to the subdivision in which the home that had been burglarized was located.  
Waln
, 120 Ill. App. 3d at 76, 457 N.E.2d at 980.  As in the instant case, there was no testimony that the officer observed anything suspicious about the two cars other than their location near the scene of a recently reported crime.  This court found that the stop was justified by the "extremely close spatial and temporal proximity" to the reported burglary, coupled with the fact that they were the only two vehicles seen leaving the subdivision.  
Waln
, 120 Ill. App. 3d at 77, 457 N.E.2d at 981.

Similarly, in the instant case, the defendant was less than two miles from the scene of a crime that had just been reported.  His was the only car coming from the direction of the shooting.  Although, as the defendant contends, it was possible that he was coming from one of the subdivisions between the Piasa Pantry and Rocky Ford Road, we note that it was also possible that the defendant in 
Waln
 could have been coming from a house in the subdivision that he was leaving at the time he was stopped.  The defendant also contends that Deputies Papa and Hoffestot lacked a reasonable and articulable suspicion to stop him because, unlike in 
Waln
, the perpetrator did not necessarily have to pass the Piasa Pantry on Boy Scout Lane to leave the scene.  Moreover, they did not know that the assailant had a vehicle or that he had left the scene at all.  We do not find these distinctions dispositive.  Boy Scout Lane was the main way of leaving the area, and the defendant was the only driver on the road.  The crime was committed in a rural area, making it reasonable to infer the use of a car to flee the scene.  It was also reasonable for the officers to infer that the perpetrator would likely be coming from that direction.  See 
Lippert
, 89 Ill. 2d at 181, 432 N.E.2d at 609 ("While it is arguable that defendant had been coming from an unexpected direction, the fact remains that he was within the area in which a search could reasonably be conducted."); 
Bujdud
, 177 Ill. App. 3d at 402, 532 N.E.2d at 374 ("Although [the detaining officer] had no information that a car was involved in the incident, we do not find it unreasonable for him to have inferred that suspects would attempt to flee the general vicinity of a crime in a car.").

In so holding, we emphasize that the very purpose of a 
Terry
 stop is to allow the officers involved to investigate their suspicions.  Thus, the cases interpreting and refining 
Terry
 have generally followed the rationale that "a short period of detention was only minimally intrusive when compared to the benefit of immediate investigation."  
Lippert
, 89 Ill. 2d at 183, 432 N.E.2d at 610.  Thus, the officers' suspicions need only rise to a level that further investigation is warranted.  Particularly given the seriousness of the crime involved, we think it reasonable for the officers to detain, in order to investigate, the only person they had seen coming from the direction of the scene of the crime.

Moreover, we think that much of the evidence the defendant sought to suppress would have been admissible under the inevitable discovery doctrine.  The inevitable discovery doctrine is an exception to the rule that evidence obtained in violation of a defendant's constitutional rights must be excluded.  If the State is able to prove that such evidence inevitably would have been discovered without the illegal police conduct, it is admissible.  
People v. Burnidge
, 178 Ill. 2d 429, 437, 687 N.E.2d 813, 817 (1997) (citing 
Nix v. Williams
, 467 U.S. 431, 448, 81 L. Ed. 2d 377, 390, 104 S. Ct. 2501, 2511 (1984)).  The defendant argues that his identity would not have been discovered if not for the stop, because the complaining witness did not know his name.  She did, however, know who he was and where he regularly sold crack.  As Dobrinich's testimony demonstrates, others in the community also knew him, and some knew him by name.  Moreover, he was driving in the complaining witness's car.  It would defy logic to find that he would not inevitably have been identified.  Because we hold that the detention was justified by a reasonable and articulable suspicion, we need not determine whether the police would have discovered the gun if not for the defendant leading them to it or whether the admission of his videotaped confessions or the fact that he led police to the gun (which we do not think would have been inevitably discovered if not for the detention) amounted to harmless error in face of the complaining witness's testimony, Dobrinich's testimony, and the other physical evidence that corroborated the victim's testimony.

III. CONCLUSION

For the foregoing reasons, we affirm the order of the trial court denying the defendant's motion to suppress, and we affirm his convictions and sentences.

Affirmed.

GOLDENHERSH and DONOVAN, JJ., concur.

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 06/27/03.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.