THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRETT W. RAY, Defendant-Appellant.

Fifth District   No. 5—00—0420

Opinion filed February 11, 2002.

KUEHN, J., specially concurring.

WELCH, J., dissenting.

Daniel M. Kirwan and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Edward C. Deters, State's Attorney, of Effingham (Norbert J. Goetten, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HOPKINS delivered the opinion of the court:

Brett W. Ray (defendant) appeals from his conviction, pursuant to a stipulated bench trial, for possession of more than 5,000 grams of cannabis (720 ILCS 550/4(g) (West 1998)). Defendant was arrested at a drug interdiction checkpoint operated by the Effingham County sheriff's department. Defendant moved to suppress evidence recovered during a search of his van at the checkpoint. The trial court denied defendant's motion to suppress. Defendant contends on appeal that the checkpoint violated his constitutional right to be free from unreasonable searches and seizures under the United States Constitution (U.S. Const., amend. IV) and the Illinois Constitution (Ill. Const. 1970, art. 1, § 6), under the holding of the recent United States Supreme Court case of *City of Indianapolis v. Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447 (2000), and that because the stop of his vehicle was unconstitutional, the trial court's denial of his motion to suppress evidence was manifestly erroneous. We reverse.

## FACTS

On December 14, 1998, defendant was traveling north on Interstate 57 (I-57) in his Ford van. Defendant's license plates reflected that he was from Florida. About a half mile south of northbound exit 151, the Watson-Mason exit, signs were placed by the Effingham County sheriff's department that stated as follows: "Drug Enforcement Checkpoint Ahead Half Mile." A second set of signs, placed approximately 100 yards after the first set of signs and before exit 151, stated as follows: "Drug Dogs in Use Ahead." There was no such checkpoint "Ahead Half Mile" on I-57, which defendant discovered when he exited at exit 151. The true drug interdiction checkpoint could not be seen from the interstate and was at the end of the exit ramp.

Defendant was stopped by Deputy Robert Rich and responded to initial questions at the checkpoint, but because Deputy Rich's suspicions were aroused by defendant's answers to his questions and by defendant's alleged nervous behavior, Deputy Rich asked defendant further questions regarding whether defendant had heroin, cocaine, or cannabis in his van. Defendant denied he possessed any of the drugs. Deputy Rich testified that when he asked defendant a second time if he possessed marijuana, defendant said that he had some in the van. Defendant refused to consent to a search of his van.

Subsequently, Corporal Paul Kuhns, a dog handler for the Effing-

ham County sheriff's department, did a "walk around" of defendant's vehicle with a dog named Fritz. After Fritz reacted to the driver's side doorjamb of the vehicle, a search of defendant's van was conducted. More than 120 pounds of cannabis were found inside a black duffel bag behind the driver's seat of the van, and defendant was placed under arrest.

Defendant filed a motion to suppress evidence based upon the illegal stop of his van. At the hearing on defendant's motion to suppress, the following pertinent evidence was adduced. Ronald Meek, the sheriff of Effingham County, testified that his department runs a drug interdiction checkpoint. The drug enforcement checkpoint was adopted after Corporal Kuhns told him about an article he had read concerning drug checkpoints that were being conducted throughout the country. Sheriff Meek considered the drug checkpoint to be a "very effective way to interdict and stop the flow of drugs in and through Effingham County." Sheriff Meek approved the written policy for conducting the drug checkpoint. Sheriff Meek stated that the purposes of the checkpoint were "to detect people that are driving without [a] driver's license, without insurance, [or with] other vehicle equipment violations, [to] remove people who could be impaired and under the influence of drugs, and to interdict the flow of narcotics through Effingham County." However, Sheriff Meek was not aware of an equipment-violation checklist employed at the checkpoint. Sheriff Meek testified that anyone coming off the interstate while a checkpoint was in operation would be a suspect for the following reasons: "[N]o valid driver's license. No valid insurance. Carrying drugs[;] you know, wanted on warrants. It could be a variety of things."

Sheriff Meek explained that the policy for the drug checkpoint required that all drivers be interviewed at the checkpoint, "except drivers recognized as having previously been passed through the check[ ]point earlier or after[—]or drivers personally recognized by the officer to be local residents who have previously been checked for license[ ] [and] insurance validity on prior occasions, or law enforcement vehicles in the course of business." Sheriff Meek agreed that the drug checkpoint policy did not define "local residents" and that whether a person was considered local was left to the officer's discretion. Sheriff Meek did not think that the drug checkpoint policy allowed an officer to stop a person again after they had been stopped once and had properly answered all of the initial mandatory questions. The questions posited at a person's initial detention at the checkpoint consisted of asking for a driver's license, for proof of insurance, whether the person owned the vehicle, whether the person saw the checkpoint signs on the highway, why the person got off the interstate

at that exit, where the person was going, and where the person was coming from.

Sheriff Meek stated that he chose that site for the drug checkpoint because there were no services at that exit. Sheriff Meek also chose the site because traffic off the exit was light and the layout of the exit afforded officer safety and traffic safety.

Corporal Kuhns testified that he drafted the policy for the drug enforcement checkpoint and that the policy was adopted on October 15, 1998. Corporal Kuhns stated that the policy was modeled after a policy used in Phelps County, Missouri. Corporal Kuhns and Deputy Rich trained at the Phelps County, Missouri, drug checkpoint. Corporal Kuhns stated that the main purpose of the checkpoint was to interdict the illegal flow of drugs through Effingham County and was also to remove unsafe, unlicensed, and uninsured motorists from the roadway.

Corporal Kuhns corroborated that the exit used for the drug checkpoint was chosen because it is "a rural exit that provides no services to people who get off the exit." Corporal Kuhns also cited safety reasons as a factor in choosing the exit. Corporal Kuhns testified that the mere fact a driver gets off of the interstate at that exit "is not enough to suspect someone" but that "it does lend suspicion to him." Corporal Kuhns also explained the purpose of the signs on the interstate: so that violators "would self-select themselves." Corporal Kuhns corroborated that any person who had previously been through the checkpoint and had complied with license and insurance requirements was allowed to pass through thereafter without being subject to another stop for license and insurance checks.

Corporal Kuhns described what the officers did after stopping a vehicle: "[You] would first visually look from where you're standing[,] in[to] the vehicle[,] to see if there are large amounts of air fresheners, masking odors, a lot of clothing in the car. When you would speak to the subject, [you would] ask him for his driver's license [and] proof of insurance[;] you would notice if the driver seemed overly nervous or excited about being in this police encounter; you would ask him the questions, if he would tell you things that you would believe to be untrue, that would raise suspicion. You would ask him where he came from. If he was coming from a source city that we know drugs often come from, that would perhaps add to the suspicion. If he was going to a destination that perhaps narcotics were traveling to[,] you would ask the reason they got off the exit." Corporal Kuhns thought that, if "everything went well," a person would only be detained initially for about two minutes. An officer's suspicions must be aroused for further detention. According to Corporal Kuhns, a checkpoint is not a net to sweep up all criminal activity.

Deputy Rich from the Effingham County sheriff's department testified that the purpose of the checkpoint was "to get unqualified driver's [sic][—]no insurance, driving under the influence, drugs." Deputy Rich stated that according to the policy for the checkpoint, everyone that comes off the interstate was a suspect; however, Deputy Rich acknowledged that the suspicion was not related to any specific crime or other misconduct. Deputy Rich believed that the policy manual for the drug checkpoint removed discretion from an officer. Deputy Rich stated that discretion to ask further questions is allowed when suspicion arises.

The trial court ruled that the stop of defendant's vehicle at the drug checkpoint did not violate his constitutional rights, and it denied defendant's motion to suppress evidence. After being convicted in a stipulated bench trial and sentenced, defendant filed his timely appeal.

## STANDARD OF REVIEW

■ The review of a constitutional issue is de novo. *Patel v. Illinois State Medical Society*, 298 Ill. App. 3d 356 (1998). A trial court's ruling on a motion to suppress will be overturned on review only if it is manifestly erroneous. *People v. Fullwiley*, 304 Ill. App. 3d 44 (1999).

## ANALYSIS

The primary issue raised by defendant is the constitutionality of the drug interdiction checkpoint, an issue addressed in the recent United States Supreme Court case of *City of Indianapolis v. Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447 (2000). However, the State asserts that *Edmond* does not apply, as there were specific and articulable facts, taken together with reasonable inferences, that warranted a *Terry* stop (*Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)). The State argues that the totality of the circumstances warranted a *Terry* stop and that, after the valid stop, probable cause arose to arrest defendant. The State contends that the act of exiting on the particular exit ramp, just prior to the supposed drug checkpoint on the interstate, raised the suspicion that defendant was trafficking in illegal drugs. Thus, before considering whether the drug checkpoint used in the case *sub judice* was constitutional, we first address whether the Effingham County police had sufficient specific and articulable facts to conduct a *Terry* stop of defendant's vehicle.

■ In *Terry*, the United States Supreme Court determined that a law officer is entitled to briefly stop a person to investigate if, given the totality of the circumstances, the police officer has specific, articulable facts, taken together with rational inferences from the facts, that warrant the intrusion. *Terry*, 392 U.S. at 21, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880. For a proper *Terry* stop, the officer's basis for the stop

must be objectively reasonable and cannot be based upon inarticulate hunches or unparticularized suspicions. *Terry*, 392 U.S. at 21-22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880; *People v. Ruffin*, 315 Ill. App. 3d 744 (2000). An evaluation of a *Terry* stop necessarily entails balancing the need for the seizure against the invasion that the seizure entails. *Terry*, 392 U.S. at 21, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879. "An officer may make an investigatory stop of a vehicle if he or she reasonably infers from the circumstances that an offense has been committed or is about to be committed." *People v. Henderson*, 266 Ill. App. 3d 882, 885 (1994).

In the case *sub judice*, the evidence in support of a *Terry* stop consisted of Officer Rich's unparticularized suspicion that any person getting off the interstate at exit 151 was suspicious of committing an unnamed crime—*i.e.*, it could be a lack of a valid driver's license, a lack of valid insurance, a lack of a valid registration, driving under the influence, or trafficking in drugs. However, there was nothing to determine what, if any, of these possible crimes was being or had been committed. Officer Rich was operating on an unparticularized and unsubstantiated hunch. Further, defendant had committed no traffic violation that would warrant a *Terry* stop. As was noted in the case of *United States v. Huguenin*, 154 F.3d 547 (6th Cir. 1998), a case factually similar to the case at bar, "a driver, who has violated no traffic law, whom an officer could not stop for a pretextual purpose away from the checkpoint [citation], may be subjected to a pretextual stop merely for choosing to travel the road on which a checkpoint has been erected," and such a stop is not to be permitted under the fourth amendment. *Huguenin*, 154 F.3d at 557. Additionally, no evidence was presented in the instant case that exit 151 from the interstate was an area of high volume for illegal drug trafficking. The location was chosen simply for its lack of services.

The State also claims that defendant's leaving the interstate is akin to evasion by flight, which the Supreme Court found to be a sufficient basis for a *Terry* stop in *Illinois v. Wardlow*, 528 U.S. 119, 145 L. Ed. 2d 570, 120 S. Ct. 673 (2000). The analysis of flight from an officer is not clearly applicable to a case such as we consider here. In *Wardlow*, the Supreme Court did not state a *per se* rule that flight from an officer is sufficient in and of itself to support a *Terry* stop, but instead, the Court reflected that this is a factor to be considered among the totality of the circumstances. The Court also found it persuasive that the defendant in *Wardlow* actually saw the police and that the area was known for heavy narcotics trafficking. Upon seeing the officers in a car, the defendant, who was carrying an opaque bag, immediately took flight. Under the totality of those circumstances, the

Supreme Court determined that these facts provided a sufficient basis for the officers to have a reasonable, articulable suspicion that criminal activity was afoot. *Wardlow*, 528 U.S. at 121-23, 145 L. Ed. 2d at 574-76, 120 S. Ct. at 674-75.

■ In the instant case, there were no particularized facts indicating that defendant was evading the police. Defendant did not see the police until he had begun his exit from the interstate, he was not in a high-crime area for narcotics trafficking, and he had done nothing but exit the interstate, an act that is not particularly incriminating in and of itself. Thus, under the totality of the circumstances in this case, we find that there were no specific, articulable facts to justify a *Terry* stop of defendant's vehicle prior to the stopping of his vehicle at the drug interdiction checkpoint.

Turning to the issue of the constitutionality of the stopping of defendant's van at the drug interdiction checkpoint, we find that the decision in the recent United States Supreme Court case of *Edmond* is dispositive. In *Edmond*, the city operated a vehicle checkpoint on the highway in an effort to interdict unlawful drugs. The checkpoint was operated pursuant to written directives designed to limit officer discretion. The directives provided that after the stopping of a certain predetermined number of vehicles at the roadblock, an officer approaches a vehicle, identifies himself, tells the driver that he or she is being stopped briefly at a drug checkpoint, and asks the driver for a license and registration. The officer looks for signs of impairment and does an open-view examination of the vehicle from the outside. A narcotics-detection dog does a walk-around of each vehicle stopped. The city set up signs before the checkpoint that indicated that a narcotics checkpoint was a certain distance ahead and that narcotics dogs were in use. The directives also provided that the officer may only conduct a search if the driver consents or if there is an appropriate quantum of "particularized suspicion." *Edmond*, 531 U.S. at 34-36, 148 L. Ed. 2d at 339-40, 121 S. Ct. at 450-51.

■ The fourth amendment to the United States Constitution (U.S. Const., amend. IV) requires searches and seizures to be reasonable, and a search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. *Edmond*, 531 U.S. at 37, 148 L. Ed. 2d at 340, 121 S. Ct. at 451. A vehicle stop at a highway checkpoint is considered a seizure within the meaning of the fourth amendment. *Edmond*, 531 U.S. at 40, 148 L. Ed. 2d at 342, 121 S. Ct. at 453; *Fullwiley*, 304 Ill. App. 3d at 49. Not all highway checkpoint programs violate the fourth amendment (*United States v. Martinez-Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976) (border patrol checkpoint designed to intercept illegal aliens did not violate

the fourth amendment); *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481 (1990) (highway sobriety checkpoint program did not violate the fourth amendment)), and a distinguishing factor as to whether a checkpoint program violates the fourth amendment is the primary purpose of the checkpoint. *Edmond*, 531 U.S. at 38-40, 148 L. Ed. 2d at 341-42, 121 S. Ct. at 452-53. When the primary purpose of a checkpoint program is to detect evidence of ordinary criminal wrongdoing, as opposed to the purpose of protecting the integrity of the border (*Martinez-Fuerte*) or highway safety (*Sitz*), the checkpoint violates the fourth amendment. *Edmond*, 531 U.S. at 41, 148 L. Ed. 2d at 343, 121 S. Ct. at 454. The Supreme Court determined that drug checkpoints are for the advancement of a general interest in crime control, and the Court declined to suspend the usual requirement of individualized suspicion in such cases and held that it could not "sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Edmond*, 531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455.

■ Generally, to determine if a seizure was reasonable under the fourth amendment, a court must weigh the public interest against the objective and subjective intrusion resulting from the roadblock. *Fullwiley*, 304 Ill. App. 3d at 49. The Supreme Court acknowledged that trafficking in illegal narcotics creates social harms of the first magnitude and is a public interest, but the Supreme Court reasoned that the same could be said of various other illegal activities, albeit to a lesser degree. *Edmond*, 531 U.S. at 42-43, 148 L. Ed. 2d at 344, 121 S. Ct. at 454-55. The Supreme Court held that because the primary purpose of the Indianapolis checkpoint program was indistinguishable from the general interest in crime control, the stops at the drug checkpoint, without a quantum of individualized suspicion, violated the fourth amendment. *Edmond*, 531 U.S. at 48, 148 L. Ed. 2d at 348, 121 S. Ct. at 458.

■ The same problem arises in the case *sub judice*. It is clear from the evidence presented that the primary purpose of the checkpoint operated by the Effingham County sheriff's department was for the interdiction of illegal drugs through Effingham County. The signs placed on the interstate indicated that the stop was for a drug checkpoint. All three of the officers of Effingham County testified that the checkpoint was first and foremost for the interdiction of illegal drugs and secondarily for other various violations.

Deputy Rich testified that everyone who exited the interstate at exit 151 was a suspect, but he could not articulate the suspicion. This

testimony establishes a generalized suspicion, not a "quantum of individualized suspicion" that the State urges was sufficient to justify the stop.

Corporal Kuhns testified that the interrogation and observations of the officers were used to develop individualized suspicion to allow a search. This testimony established that "interrogation and inspection may reveal that any given motorist has committed some crime," a method not sanctioned by the Supreme Court. *Edmond*, 531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455.

Just as in *Edmond*, the public interest herein is a desire to thwart the trafficking of illegal drugs. The Supreme Court did not consider this public interest sufficient to outweigh the subjective and intrusive nature of the drug checkpoint. In the instant case, the public interest is outweighed by the intrusive nature of the drug checkpoint. The purpose was for general crime control and was an insufficient public interest to outweigh the private interests. Further, the questions asked—specifically, why the person was getting off at that exit, where the person was coming from, and where the person was going—were highly intrusive. Asking a person's destination or departure point and using the answer as the basis of suspicion is a highly subjective and objective intrusion. Thus, a weighing of the interests establishes that the drug checkpoint violated defendant's fourth amendment rights.

Here, there were insufficient specific and articulable facts to warrant a *Terry* stop, and there was no individualized suspicion to justify the seizure of defendant at the drug interdiction checkpoint. The stop of defendant's vehicle was unconstitutional under the fourth amendment to the United States Constitution. Because the seizure of defendant's vehicle was invalid, the search of defendant's vehicle was invalid, and the evidence obtained resulted from the illegal stop. See *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Therefore, the trial court's denial of defendant's motion to suppress was manifestly erroneous. We reverse the trial court's denial of the motion. Because there is insufficient evidence remaining to convict defendant if the illegally obtained evidence is excluded, we also reverse defendant's conviction and sentence.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Effingham County is reversed.

Reversed.

JUSTICE KUEHN, specially concurring:

The recent United States Supreme Court decision handed down in *City of Indianapolis v. Edmond,* 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447 (2000), would appear to control the outcome of this case. Since the Effingham County sheriff's enterprising, and quite successful, exploration for illegal drugs required the indiscriminate stop and detention of everyone who happened to travel exit 151, it echoes the indiscriminate drug exploration engaged in by the Indianapolis police officers, an operation reviewed, and struck down, by the high court. There is no constitutional salvation in this particular operation's deceitful twist, for its potential lure of drug-toting criminals onto exit 151, and into police custody for interrogation, provided no means for differentiating potential offenders from innocent wayfarers using the exit to simply get somewhere. Moreover, every traveler had a constitutional right to avoid the indiscriminate detention and search that the signs claimed would lie ahead. Their travel of a different route was a simple exercise of that right.

The dissent is taken by the authorities' use of phony warnings designed to arouse fear that an imminent roadblock, complete with drug-dog searches, awaited anyone who continued to travel north on Interstate 57. Such impending prospect would prove a serious threat to drug traffickers. Since it would tend to chase wrongdoers with something to hide from the interstate, and exit 151 afforded the most ready avenue of escape, we are told that the deputies from Effingham County possessed something that the Indianapolis police officers lacked—an individualized suspicion that those who disembarked Interstate 57 by way of exit 151 were engaged in criminal activity. Since whatever suspicions the deputies possessed were derived solely from a traveler's decision to get off of the interstate at exit 151, we are left with the question whether that decision could afford a legal justification for the universal detention of the traveling public and the indiscriminate investigation into the circumstances of their travels.

The interstate highway system is the primary instrumentality by which people move from state to state within this country. When travelers utilize it, they must inevitably exit it and travel other highways and roads in order to get where they ultimately want to go. A cursory look at an Illinois road map instructs that interstate travelers from all points south of Effingham would likely take exit 151 if their final destination was any one of the following Illinois towns: Watson, Mason, Heartville, Dieterich, Newton, Oblong, or Robinson. It could also be the exit of choice for travelers trying to visit the southern part of Effingham. Most assuredly, it would become the obvious exit of choice for anyone wanting to go anywhere in Effingham if they read

signs suggestive of a roadblock on the interstate between exit 151 and the other Effingham exits that lie to the north.

People traveling the interstate are usually interested in getting somewhere at an appointed hour. Any interstate traveler, intent on getting to Mattoon, Champaign, Terre Haute, Kankakee, or Chicago without the prospect of uncertain delay and bother, might easily decide to forgo the interstate for a brief time in order to avoid policemen and their dogs as they tried to ferret out drug traffickers from among the mass of cars and trucks rolling in their direction. The notion of an interstate roadblock with an unidentified number of drug-sniffing dogs in use might arouse a vision of traffic congestion and delay. Time-conscious travelers, with this uncertain image in mind, could be expected to consult a road map to determine whether an efficient alternate route of travel could allow them to bypass the operation. People seeking nothing more than to continue their travels in unobstructed fashion could decide to take exit 151. Given the uncertain alternative ahead, the exit's use would be the smart move. It lies approximately a mile or so away from Highway 45, which runs north and south, and intersects Interstate 57 a dozen or so miles to the north, at a point beyond the phantom policemen and their phantom dogs. Exit 151 afforded an easy alternate route of travel that could avoid a police operation that promised a potential for significant delay and inconvenience.

Thus, there were several legitimate reasons why people might have taken exit 151, even if access to gas stations or fast-food restaurants was not one of them. There was every possibility that people taking the exit were taking it to get where they wanted to go. And within that possibility was the likelihood that some of the people were using exit 151 to ensure continued travel by avoiding the phantom roadblock—the precise motivation that we are told gives rise to an individualized suspicion that they were engaging in criminal activity.

The dissent recognizes that the success of the operation cannot justify the means employed, if those means were illegal. Nonetheless, it boasts of the operation's ultimate success at finding contraband. I view the operation's statistics differently. First, I wonder about the need for a scorecard. Obviously, someone must have thought that the operation's statistical percentage of success would provide the measure of its validity. Indeed, the State makes note of it in its arguments. I look at the statistics and see all of the innocent people who were treated like drug traffickers in order to meet the operation's objective. I see people stopped, detained, interrogated, and searched by drug-sniffing dogs, without reason to support it. Since the deputies had no way to divine who was using exit 151 for a legitimate purpose and who

was using it to conceal the transport of narcotics, 4 out of every 10 people whose fourth amendment right was violated belie the operation's validity, even if we were of a mind to allow the ends to justify the means. Before a percentage of success makes any of us feel too good about what was done, we might consider how it must have felt to have an effort to get somewhere brought to a halt so that deputies could detain, interrogate, and search under a protocol that viewed every traveler as a drug smuggler.

We know that anyone who exited the interstate immediately became a criminal suspect. Everyone suffered detention as a criminal suspect and interrogation as a criminal suspect. One of the several questions asked was a question about why the traveler decided to get off of the interstate. Those who simply acknowledged that their reason was to bypass the announced checkpoint and keep heading north undoubtedly discovered the ignominious experience of prolonged detention, complete with strained and heightened efforts to probe the interior of their cars and a thorough search from a drug-sniffing German shepherd and its handler.

There was one reason, and one reason alone, for the deputies to consider all of these innocent travelers criminal suspects—their decision to take exit 151, the next exit after the warning of an ongoing drug probe ahead on the interstate. The dissent finds, "These drivers were stopped for questioning because the police reasonably believed that, by attempting to evade the checkpoint, they possessed drugs." 327 Ill. App. 3d at 918-19 (Welch, J., dissenting). Of course, this view accepts the flaws inherent in this operation. First, there is nothing in particular, and, therefore, nothing reasonable, about a suspicion that everyone who decided to leave the interstate at exit 151 did so in an attempt to evade the checkpoint.

More important, the warning signs possessed the ability to chase innocent, as well as culpable, travelers off of the interstate and into the snare. While the signs were intentionally vague, their design was capable of evoking widespread fear of undue delay while authorities conducted what would seemingly be an extensive operation, given its application to all interstate traffic. Hence, the prospect of an interstate roadblock complete with dog-assisted searches was something a driver could decide to forgo without raising individualized suspicion of criminal wrongdoing to a level that justified detention.

Finally, there was no obligation on the part of any interstate traveler, even one who possessed contraband, to drive on and submit to a police encounter, had the phantom roadblock indeed existed. Any driver who decided to travel a different public way in order to avoid the phantom operation, whether motivated by a desire to evade perceived delay or, for that matter, by a desire to avoid indiscriminate

searches of his belongings and the invasion of privacy that such searches would entail, would have made a decision entirely consistent with constitutional guarantees to which he was entitled. A conscious decision to avoid the potential indiscriminate search of which the signs warned, not unlike the refusal of a request for consent to search, would not create a reasonable suspicion of criminal wrongdoing. While the exercise of every constitutional right in the face of an official request to surrender it raises official suspicion and heightens the belief that an individual must have something to hide, the exercise of that right is not an act of evasion that authorizes its abrogation or its diminution.

The State correctly points out that evasion by flight has been held to provide the degree of suspicion necessary to justify a *Terry* stop. *Illinois v. Wardlow*, 528 U.S. 119, 124-25, 145 L. Ed. 2d 570, 576-77, 120 S. Ct. 673, 676 (2000). However, evasion by flight is something different from a citizen's decision to simply avoid an encounter with the police. The flight must be unambiguous in order to provide the articulable suspicion necessary to warrant a *Terry* stop and detention. *People v. Thomas*, 198 Ill. 2d 103, 759 N.E.2d 899 (2001). Here, the act of leaving the interstate was replete with ambiguity. Even an admission that the interstate was exited for the express purpose of avoiding the announced drug checkpoint would not remove that ambiguity. The only way authorities could remove it, and determine that a given exit was indeed an act of flight designed to prevent the detection of illegal drugs, was to find illegal drugs. By that time, whoever had them, along with every other individual who decided to exit the interstate, had already been subjected to an unreasonable seizure. The only available means authorities had to remove the uncertainty inherent in every car's approach was to view everyone as a criminal suspect: to stop them, to detain them, to interrogate them, and ultimately, to search them. In the subjective mind of the detaining officer, no one was free to leave until they passed all of the protocol's tests. The only reason to support the seizure, detention, and interrogation was a traveler's presence on an exit that allowed people to travel from one place to the next.

Since a seizure cannot be justified by its success (*Byars v. United States*, 273 U.S. 28, 29-30, 71 L. Ed. 520, 522, 47 S. Ct. 248, 248-49 (1927)), the seizure in this case cannot be justified. Accordingly, I specially concur.

JUSTICE WELCH, dissenting:

I respectfully dissent, because I believe that the facts support a finding of a valid *Terry* stop and that the suspicionless stop in *Ed-*

*mond* is distinguishable from the instant case. *City of Indianapolis v. Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447 (2000); *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

The fourth amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. The fourth amendment is applicable to the states under the fourteenth amendment. U.S. Const., amend. XIV. Stopping an automobile at a highway checkpoint constitutes a seizure under the fourth amendment. *Michigan Department of State Police v. Sitz*, 496 U.S. 444, 450, 110 L. Ed. 2d 412, 420, 110 S. Ct. 2481, 2485 (1990).

However, in *Terry* the United States Supreme Court held that a police officer could briefly detain a person for investigatory purposes in some circumstances. *Terry*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. Under the *Terry* exception, a police officer may briefly stop a person for temporary questioning if the officer reasonably believes that the person has committed, or is about to commit, a crime. *Terry*, 392 U.S. at 22, 20 L. Ed. 2d at 906-07, 88 S. Ct. at 1880; *People v. Flowers*, 179 Ill. 2d 257, 262 (1997) (recognizing *Terry*). The *Terry* standards have been codified in our Code of Criminal Procedure of 1963 (725 ILCS 5/107—14 (West 1998)).

The stop under *Terry* must have been justified at its inception; a court objectively considers whether the police action was appropriate based on the facts available to the police officer. *Terry*, 392 U.S. at 20-21, 20 L. Ed. 2d at 905-06, 88 S. Ct. at 1879-80; *People v. Long*, 99 Ill. 2d 219, 227-28 (1983). To justify the intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant that intrusion. *Terry*, 392 U.S. at 20-21, 20 L. Ed. 2d at 905-06, 88 S. Ct. at 1879-80; *People v. Long*, 99 Ill. 2d 219, 227-28 (1983).

Under *Terry*, some quantum of individualized suspicion is required. See *United States v. Martinez-Fuerte*, 428 U.S. 543, 560-61, 49 L. Ed. 2d 1116, 1130, 96 S. Ct. 3074, 3084 (1976). In evaluating the validity of a *Terry* stop, we consider the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 8, 104 L. Ed. 2d 1, 10, 109 S. Ct. 1581, 1585 (1989).

In this case, the *Terry* exception has been satisfied. At the checkpoint, defendant and all other drivers were stopped after bypassing a phantom drug checkpoint and attempting to reach a remote road with no services. These specific facts, taken together with rational inferences, reasonably warrant a brief intrusion. These drivers were stopped for questioning because the police reasonably believed that, by

attempting to evade the checkpoint, they possessed drugs. When viewing the totality of the circumstances, I believe that each driver stopped was a suspect. Those drivers who had good reason to exit the interstate due to local business or residency were allowed to quickly extricate themselves from suspicion and go about their way.

*City of Indianapolis v. Edmond* is readily distinguishable from this case. *Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447. The stop in *Edmond* was a suspicionless stop, but the stop in the instant case was based on an individualized reasonable suspicion. In *Edmond*, the checkpoints were established on Indianapolis roads, thoroughfares, to ensnare drivers in dragnet fashion. Here, only suspect drivers were stopped at the end of a seldom-used exit ramp while trying to reach a remote road with no services after evading a putative drug checkpoint.

Defendant, having been constitutionally stopped, then admitted to possessing drugs. At that time, probable cause was present to search his vehicle. See *People v. Tisler*, 103 Ill. 2d 226, 236 (1984).

I see no need to perform a reasonableness analysis of the checkpoint itself by balancing the need to search against the invasion that the search entails (see, *e.g., Brown v. Texas*, 443 U.S. 47, 50-51, 61 L. Ed. 2d 357, 361-62, 99 S. Ct. 2637, 2640 (1979); *People v. Bartley*, 109 Ill. 2d 273, 280 (1985)), because the constitutional exception under *Terry* has been satisfied based on a reasonable suspicion (*Terry*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868).

The members of the majority have followed the approach taken by the United States Court of Appeals in *United States v. Arvizu*, 232 F.3d 1241, 1248-51 (9th Cir. 2000), and discredited by the United States Supreme Court. They are really viewing the factors individually in a vacuum, not considering them in terms of the totality of the circumstances and then giving each factor a "no weight" innocent conclusion. See *United States v. Arvizu*, 534 U.S. 266, 151 L. Ed. 2d 740, 122 S. Ct. 744 (2002).

Although a seizure may not be justified by its success (see *Byars v. United States*, 273 U.S. 28, 29, 71 L. Ed. 520, 522, 47 S. Ct. 248, 248-49 (1927)), it is interesting that this checkpoint yielded a 70% violation rate of nonlocal drivers, with more than 60% having narcotics, as testified to by Corporal Kuhns at the suppression hearing.

Therefore, I would affirm the circuit court's denial of defendant's motion to suppress and affirm his conviction and sentence.