No. 3-04-0761

_____

APPELLATE COURT OF ILLINOIS
filed June 28, 2006
THIRD DISTRICT

A.D., 2006

_____

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) ) ) | Appeal from the Circuit Court for the 21st Judicial Circuit, Kankakee County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | 99–CF–229 |
| JAVAR HOLLINS, | ) ) ) | Honorable Clark Erickson |
| Defendant -Appellant. | ) ) | Judge, Presiding |

_____

_____

JUSTICE McDADE delivered the opinion of the court:

_____

_____

Defendant brings this appeal claiming that his right to be tried by a jury chosen from a fair cross-section of his community was violated when the Kankakee County jury coordinator intentionally manipulated the racial composition of his jury venire. The trial court rejected defendant's claim on the procedural grounds that he waived any right to challenge the composition of the jury venire when he failed to object at the time of jury selection. The court also rejected defendant's argument on the substantive grounds that he did not demonstrate how he was prejudiced by the jury coordinator's intentional manipulation. Because we find that defendant's equal protection and due process rights have been violated, we reverse and remand

1

this matter for a new trial.

## BACKGROUND

Defendant was charged by indictment with six counts of first degree murder, one count of armed robbery and one count of unlawful use of a weapon. Defendant's case proceeded to trial. An initial subpool of 46 jurors was assigned to defendant's trial. Of the 46 jurors, 18 were individuals from traditionally underrepresented groups.[1] When the first group of potential jurors was called for *voir dire*, all 14 members were individuals from traditionally underrepresented groups, 11 being African-American. The first two potential jurors called to replace those who were excused from the first 14 were also African-American. Therefore, the first 16 people called from the jury venire were individuals from traditionally underrepresented groups, 13 of whom were African-American.

Of the remaining 32 potential jurors in the initial subpool, only 2 were individuals from traditionally underrepresented groups, both being African-American. A full jury was not selected from the initial subpool of 46 jurors. As a result, the judge ordered that 12 more potential jurors be assigned to defendant's trial. The record is unclear as to the racial makeup of the additional 12 jurors. Upon completion of *voir dire*, a full jury was impaneled. Defendant did not make any objections to the jury venire during the *voir dire* proceedings. At the

---

[1] While we recognize the somewhat cumbersome effect the use of term "individuals from traditionally underrepresented groups" may have on our analysis, we also recognize the impropriety in using the word "minority" to describe an individual. We cite the dictionary definition of "minority" meaning "less than," as evidence that the term is inappropriate. See Merriam-Webster's Collegiate Dictionary 757 (10th ed. 2000). Moreover, the term "minority" conveys similarly demeaning implications as does the expressions "culturally deprived," "lower class," "mentally challenged" and so on. We therefore choose to use the term "individuals from traditionally underrepresented groups," the language often associated with equal protection challenges under the fourteenth amendment.

completion of *voir dire*, the defendant's jury consisted of four African-Americans and eight Caucasians.

The case proceeded to trial and the jury found the defendant guilty of two counts of first degree murder. Subsequently, defendant filed a motion for a new trial asserting that the odd distribution of individuals from traditionally underrepresented groups suggested that the selection of the jury venire was not random. At the first hearing on the issue, defense counsel stated that he did not know what happened, but felt certain that something about the selection of the jury venire was not right. Defendant argued that the trial court erred in failing to *sua sponte* excuse the jury panel. The trial judge continued the case for additional investigation and evidence.

As a result of the concerns raised in this case and in other Kankakee County cases, an administrative investigation was conducted concerning the selection of jury panels in the county. The investigation included an audit performed by Judicial Systems, Inc., the vendor of the software used to manage juror assignment in Kankakee County. That investigation did not commence until two months after defendant's jury trial concluded. The investigation revealed that the assignment of potential jurors to jury panels during the period of July 21, 2003, through June 7, 2004, had been intentionally manipulated by the Kankakee County jury coordinator in an effort to change several panels' racial composition. These findings were submitted to the trial court in the form of an administrative report. The trial court reviewed the report and admitted it into evidence during a second hearing on defendant's motion for a new trial. The court then went on to make the following findings of fact: first, the jury coordinator had intentionally manipulated the assignment of potential jurors to panels to increase the number of individuals

3

from traditionally underrepresented groups in the defendant's panel; second, the coordinator repeatedly lied to investigators concerning her actions; and third, as a result of the coordinator's actions, the first 16 potential jurors who were called during the defendant's *voir dire* were individuals from traditionally underrepresented groups.

As to the intentional manipulation the court stated:

"The court reviewed the Jury History Reports for each of the jurors initially called into the courtroom for *voir dire* in the Hollins case. * * * The Jury History Reports for jurors 1 through 35 reflect the history of the jurors chosen from the jury pool to serve in a sub panel which was then sent to the courtroom for jury selection in the Hollins case. It is apparent from a review of the Jury History Reports that jurors 1 through 16 were processed differently than jurors 17 through 35. Jurors 1 through 16 all had their status codes changed from 1 to 2. This status change is made manually. The result of a status change from 1 to 2 is that this change automatically assigns a juror to a particular sub panel, in this case the sub panel for the Hollins case. Jurors 17 through 35 were selected randomly from the jury pool for the Hollins case sub pool. The Jury History Reports reflect that Patricia Johnson was the individual who created this sub pool. It is evident from the Jury History Report analysis that Patricia Johnson manually changed the status codes for jurors 1 through 16, thus requiring the

4

computer to put the names of those jurors into the Hollins sub pool. Jurors 17 through 35 were then randomly selected from the jury pool to become part of the Hollins sub pool. It is not disputed that the first 16 jurors were minority and that of the remaining 18 only 2 were minority. It is thus apparent that Patricia Johnson created a jury sub panel which had a disproportionate number of minority jurors, and that this sub panel was then directed to the courtroom in which the Hollins case *voir dire* was to take place."

Upon making these findings, the trial court found that defendant was not deprived of a fair and impartial jury by the coordinator's intentional manipulation of his jury panel.

The court also found that Illinois law requires that all objections to a jury panel must be made at the time of *voir dire*. Therefore, the court held defendant waived any right to challenge the composition of the jury venire when he failed to object at the time of jury selection. Furthermore, the court held defendant was not entitled to a new trial because he failed to demonstrate how he was prejudiced by the jury coordinator's intentional manipulation. Consequently, the trial court denied defendant's motion for a new trial and this appeal followed.

ANALYSIS

Equal Protection Violation

Defendant's sole claim on appeal is that he was denied a fair trial because the jury venire, from which his jury was selected, was intentionally manipulated in violation of the equal protection clause of the fourteenth amendment to the United States Constitution. U.S. Const., amend. XIV. Specifically, defendant asserts that his right to be tried by a jury chosen from a fair

5

cross-section of his community was violated, when the jury coordinator of his county systematically excluded Caucasians from his jury venire. Because an equal protection claim is a constitutional question, our review is *de novo*. *People v. Ray*, 327 Ill. App. 3d 904, 909, 764 N.E.2d 173, 177 (2002).

The United States Supreme Court has repeatedly held that the equal protection clause of the fourteenth amendment prohibits the exclusion of any individual juror from a jury on account of his or her race. *Georgia v. McCollum*, 505 U.S. 42, 48, 120 L. Ed. 2d 33, 44, 112 S. Ct. 2348, 2353 (1992); *Powers v. Ohio* 499 U.S. 400, 409, 113 L. Ed. 2d 411, 424, 111 S. Ct. 1364, 1370 (1991). The Supreme Court in *Castaneda v. Partida*, 430 U.S. 482, 494, 51 L. Ed. 2d 498, 510, 97 S. Ct. 1272, 1280 (1977), set out the test to be used in determining if a defendant has made out a *prima facie* showing of discrimination resulting in an equal protection violation. To establish a *prima facie* equal protection violation, the defendant must: (1) show that the excluded group is a cognizable class; (2) show that the class is underrepresented in the defendant's jury pool; and (3) show that the underrepresentation is the result of the systematic exclusion of the class from juries.

As an initial matter, we do not believe the usual numerical calculations used to determine an equal protection violation are necessary in this case. The trial court found that the jury coordinator intentionally removed 14 Caucasians who had already been randomly assigned to defendant's jury pool because they were white. That undisputed fact, standing alone, satisfies all three elements of the *Castaneda* test. The excluded Caucasian group constitutes a cognizable racial class. Their deliberate removal from a pool to which they had already been assigned through the court's random selection process shows that Caucasians were in fact

6

underrepresented in defendant's jury pool.  It is judicially confirmed that the underrepresentation resulted from deliberate, systematic exclusion of the class from multiple jury pools, including defendant's, as well as deliberate systematic exclusion of African-Americans from other jury pools.

Because we also believe the equal protection violation can be demonstrated by application of the *Castaneda* test, we undertake the *Castenada* analysis.  In applying this test, the defendant has met requirement numbers one and three.  Specifically, defendant has proven that Caucasians are a cognizable racial group.  Defendant has also proven that the Kankakee County jury commissioner systematically excluded a number of Caucasians from defendant's jury venire.  Therefore, the only remaining question under the *Castaneda* test, is whether the defendant has shown that Caucasians were underrepresented in his jury pool.  In an attempt to do so, defendant presents evidence that "the population of Kankakee County is 79.9   white, while the population of the defendant's original jury venire was 60.9   white, a disparity of nearly 20  ." We seek guidance from four United States Supreme Court cases in determining whether this representation of Caucasians on defendant's jury venire meets the degree of underrepresentation required to prevail on his equal protection claim.

The degree of underrepresentation is shown by comparing the proportion of the group in the total population to the proportion called to serve as jurors. *Castaneda*, 430 U.S. at 494, 51 L. Ed. 2d at 510, 97 S. Ct. at 1280. The Supreme Court in *Casaneda* found a *prima facie* case of discrimination where the defendant showed that the population of Hidalgo County was 79.1   Mexican-American, but that, over an 11-year period, only 39   of the persons summoned for grand jury service were Mexican-American.  See also *Turner v. Fouche*, 396 U.S. 346, 24 L.Ed. 2d 567, 90 S. Ct. 532 1970   a grand jury list consisting of only 37   African-Americans was sufficient evidence to satisfy the under-representation prong where the county population was 60

African-American *Sims v. Georgia,* 389 U.S. 404, 19 L. Ed. 2d 634, 88 S. Ct. 523 1967 evidence showing African-Americans constituted 24.4 of the individual taxpayers in a county, but the fact that the county's grand jury list only represented 4.7 was evidence of discrimination *Whitus v. Georgia,* 385 U.S. 545, 17 L. Ed. 2d 599, 87 S. Ct. 643 1967 the disparity of African-Americans listed on the tax digest amounting to 27.1 of the taxpayers, but only 9.1 of those on the grand jury venire, was held to be sufficient to make out a *prima facie* case of discrimination .

In light of these cases, it is clear that defendant has successfully shown that the proportion of Caucasians called to serve as jurors on his venire was underrepresented in relation to the number of Caucasians found in Kankakee County's general population. Specifically, defendant has shown a disparity of approximately 20 . Similar percentages have been held by the Supreme Court to be sufficient to make out a *prima facie* case of discrimination. In those cases, the court relied on such percentages in coming to the conclusion that a certain cognizable group of the population was excluded on the basis of race. Here, however, as previously noted, we do not need any percentages to come to the conclusion that certain individuals were intentionally excluded from defendant's jury venire on the basis of race. The audit performed by Judicial Systems, Inc., found that the county jury commissioner intentionally and arbitrarily manipulated the racial composition of defendant's jury venire. Such bias and manipulation shatters one of the most basic tenants of the fourteenth amendment – that no individual juror may be excluded from any jury on account of his or her race.

Although we recognize that there is no requirement that there be an exact statistical match between the jury pool and the county population, it is the randomness of the selection process that should, over time, result in a reasonably congruent balance between the pool and the population. Here, the randomness was eliminated by the deliberate manipulation of the pool by the county jury commissioner. "The fourteenth

8

amendment's mandate that race discrimination be eliminated from all official acts and proceedings of the State is most compelling in the judicial system." *Powers v. Ohio*, 499 U.S. 400, 415, 113 L. Ed. 2d 411, 428, III S. Ct. 1364, 1373 1991 . We are therefore, under an affirmative duty to enforce the constitutional policies embodied in that prohibition. In acting upon that duty, we find defendant's equal protection rights have been violated.

### Due Process violation

Although defendant does not specifically raise the issue of due process here on appeal, the fact remains that defendant's entire argument has been framed in the context of fourteenth amendment principles. "These principles compel the conclusion that a State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States." *Peters v. Kiff*, 407 U.S. 493, 502, 33 L. Ed. 2d 83, 94, 92 S. Ct. 2163, 2168 (1972). Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. *Peters*, 407 U.S. at 502, 33 L. Ed. 2d at 94, 92 S. Ct. at 2168. They create the appearance of bias in the decision of individual cases and increase the risk of actual bias as well. *Peters*, 407 U.S. at 503, 33 L. Ed. 2d at 94, 92 S. Ct. at 2168. Accordingly, we address the due process implications of the equal protection violation.

The United States Supreme Court in *Peters* examined the question of whether a Caucasian defendant had a substantive constitutional right to set aside his conviction upon proof that African-Americans had been systematically excluded from the state grand and petit juries which indicted and tried him. *Peters*, 407 U.S. at 504, 33 L. Ed. 2d at 95, 92 S. Ct. at 2169. The Court in answering in the affirmative held that any defendant, regardless of his race, has standing

9

to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excluded from service members of any race, thereby denying him due process of the law. *Peters*, 407 U.S. at 504, 33 L. Ed. 2d at 95, 92 S. Ct. at 2169.

The Supreme Court in *Taylor v. Louisiana*, 419 U.S. 522, 530-31, 42 L. Ed. 2d. 690, 698, 95 S. Ct. 692, 698 (1975) further clarified the necessity of following proper procedure when constructing juries.  The court stated:

> "The purpose of a jury is to guard against the exercise of arbitrary power -- to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps over-conditioned or biased response of a judge. [Citation.]  This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool.  Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial.  'Trial by jury' presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case. . . . [The]

10

broad representative character of the jury should be maintained,
partly as assurance of a diffused impartiality and partly because
sharing in the administration of justice is a phase of civic
responsibility. [Citation.]" *Taylor*, 419 U.S. at 530-31, 42 L. Ed.
2d at 698, 95 S. Ct. at 698.

In the case at bar, there is no question that the jury coordinator intentionally manipulated defendant's jury venire on the basis of race. The Supreme Court has repeatedly held that the Constitution prohibits such arbitrary actions. Congress itself has made such exclusion a crime under 18 U.S.C. § 243 (2000), reflecting the central concern of the fourteenth amendment with racial discrimination. Though some may argue that the precedent announced in *Peters* and *Taylor* is inapplicable on the basis that the manipulation here did not result in the wholesale exclusion of any specific race, we would not agree. We find that any arbitrary manipulation of any jury pool on the basis of race, constitutes an actionable due process violation. We adhere to this rule regardless of whether it was one individual from traditionally underrepresented groups that was arbitrarily excluded or in the alternative, the entire group. We simply can not allow such prejudicial conduct to invade the courtrooms, where due process guarantees all persons the right to a fair trial in a fair tribunal. The coordinator's intentional manipulation of defendant's jury venire on the basis of race, not only tarnishes our entire jury system but also, constitutes a violation of defendant's due process rights.

### Prejudice is presumed

Although we have found that defendant's equal protection and due process rights have been violated, the question remains whether defendant's conviction should be overturned on this basis. In examining this

11

question, the trial court found the commissioner's actions did not constitute reversible error because the defendant failed to show prejudice. However, where such an egregious action systematically excludes certain individuals from jury service on the basis of race, we should not deem it necessary for the defendant to affirmatively demonstrate the existence of actual prejudice in the resulting jury panel. Under such circumstances, prejudice may be presumed. As the United States Supreme Court stated in Peters

"It is in the nature of the practices here challenged that proof of actual harm, or lack of harm, is virtually impossible to adduce. For there is no way to determine what jury would have been selected under a constitutionally valid selection system, or how that jury would have decided the case. Consequently, it is necessary to decide on principle which side shall suffer the consequences of unavoidable uncertainty. Citations. In light of the great potential for harm latent in an unconstitutional jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too many defendants, rather than giving it to too few." Peters, 407 U.S. at 504, 33 L. Ed. 2d at 94-95, 92 S. Ct. at 2169 1972 .

In the instant appeal, essential demands of fairness dictate that the errors of the jury commissioner not be visited upon the defendant. Here, the commissioner intentionally manipulated the jury venire in an effort to adjust its racial composition. To require the defendant to demonstrate how he was prejudiced by such an action requires him to provide proof which, as the Supreme Court states, "is virtually impossible to adduce." Such a situation leaves the defendant without an effective remedy for improper conduct in the jury selection process and provides incentive for such conduct to recur. Accordingly, we conclude that the

12

arbitrary and systematic exclusion of Caucasian jurors from the defendant's jury venire is presumptively prejudicial.

## Waiver

In denying defendant's motion for a new trial, the court ruled that the defendant waived any objection to the jury commissioner's actions by failing to object during *voir dire*. We find this reasoning to be erroneous. Defendant's failure to object to the jury panel during *voir dire* did not constitute a valid waiver. The United States Supreme Court has held that the question of a waiver of a federally guaranteed constitutional right is a question controlled by federal law. *Brookhart v. Janis*, 384 U.S. 1, 4, 16 L. Ed. 2d 314, 317, 86 S. Ct. 1245, 1247 (1966). The Court has also held that "there is a presumption against the waiver of constitutional rights, [Citation] and for a waiver to be effective it must be clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.' [Citation.]" *Brookhart*, 384 U.S. at 4, 16 L. Ed. 2d at 317, 86 S. Ct. at 1247. "In making this determination, courts must examine 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' [Citation.]" *Connecticut v. Barrett*, 479 U.S. 523, 531, 93 L. Ed. 2d 920, 930, 107 S. Ct. 828, 833 (1987). (Brennan, J., concurring).

Although this case was the primary reason for the Kankakee County sheriff's investigation into the procedures used to makeup jury subpools, the record reveals that the investigation did not commence until two months after defendant's jury trial concluded. It was not until defendant was furnished with a copy of the investigative report that he had any evidence with which he could support an accusation that the jury coordinator had manipulated the assignment of jurors based on their race. We cannot agree with the State's argument that

13

counsel knew or at least should have known of the manipulation due to the fact that the first 16 jurors called were individuals from traditionally underrepresented groups. It would be interesting to ask the State at exactly what point counsel was "supposed to know" that the venire had been intentionally and arbitrarily manipulated. Inasmuch as the process is supposed to be random, it is certainly mathematically possible that the first 16 individuals called would be individuals from traditionally underrepresented groups. Consequently, that mere fact did not somehow notify the defendant that the county has engaged in intentional racial manipulation of his venire.

Examining the "particular facts and circumstances surrounding this case," it is clear counsel preserved the issue by raising it when he first had reason to believe that the distribution of jurors in the panel might have been the result of purposeful acts on the part of the jury coordinator. The issue was not waived. Furthermore, the defendant in *Peters* did not raise his claim that African-Americans were systematically excluded from his grand and petit juries until seven months after his trial. In holding that defendant had standing to bring his due process challenge seven months after trial, the Court implicitly rejected any claim of waiver. Here, counsel raised his challenge to the jury venire selection process a mere nine days after the first recorded action was taken in the investigation. Consequently, we should find the trial court erred in deeming the issue waived.

CONCLUSION

In the case at bar, there is no question that the jury coordinator intentionally manipulated defendant's jury venire on the basis of race. Such actions violate the very foundation of the fourteenth amendment. We therefore hold that any arbitrary manipulation of any jury pool on

14

the basis of race, constitutes an actionable equal protection and due process violation. We find that the trial court erred in dismissing defendant's motion on the substantive basis that he did not prove prejudice. Instead, *we do not deem it necessary for the defendant to affirmatively demonstrate the existence of actual prejudice where such an egregious action systematically excludes certain individuals from jury service on the basis of race. Furthermore, we find that the trial court erred in dismissing defendant's motion on the procedural basis that he waived* any right to challenge the composition of the jury venire when he failed to object at the time of jury selection. Upon examination of the "particular facts and circumstances surrounding of this case," it is clear that defendant did not and could not know of the commissioner's manipulation. As a result, any alleged waiver was not intentional or knowing and was, consequently, not valid. It is our duty, as well as that of the State, to see that every citizen, when brought before the justice system, be afforded the protection that the Constitution guarantees. Where, as in this case, an individual's constitutional rights are blatantly violated, that individual's conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained.

For the reasons stated above, we reverse the judgment of the trial court. We remand the cause for a new trial.

Reversed and remanded.

O'BRIEN, J., concurs.

SCHMIDT, P.J., specially concurs.


PRESIDING JUSTICE SCHMIDT, specially concurring:

I do not believe that any violation of Javar Hollins'

15

constitutional rights prejudiced him in the sense that the outcome was affected.  The jury commissioner in this case intentionally tampered with the jury pool in an obviously misguided attempt to benefit the defendant.  Nonetheless, the State correctly points out that defendant suffered no prejudice.  Our supreme court recently defined Illinois's plain-error doctrine as follows:

"The plain-error doctrine, as it has developed in Illinois, allows a reviewing court to reach a forfeited error affecting substantial rights in two circumstances.  First, where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent person was wrongly convicted. [Citation.]  Second, where the error is so serious that the defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process. [Citations.] This so-called disjunctive test does not offer two divergent interpretations of plain error, but instead two different ways to ensure the same thing-

namely, a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467, 475 (2005).

It seems that under the second prong, the violation of a substantial right need not have affected the outcome of the trial, otherwise we would only have one prong.

I concur only because reversal is the only remedy available to us in light of the fact that we do not have the authority to fire the jury commissioner. I believe that the idea of manipulating jury pools is so over the top that to allow this would seriously undermine the public's confidence in the judicial system. If the jury pool can be manipulated in this case, why not others? The cost of retrying defendant pales in comparison to the damage to be done to the system by allowing the conviction to stand.